**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**MERCHANT CAPITAL, LLC, Steven C. Wyer, and Kurt V. Beasley, Defendants.**

**Civil Action No. 1:02–CV–2984–MHS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 10, 2005.

were formed to purchase and collect debt pools consisting of freshly charged off consumer debt.

Specifically, the SEC alleged that Merchant Capital's sales materials misrepresented the fees to be charged in connection with the operation of the partnerships, the independent nature of the partnerships, and the role played by Merchant Capital as the managing general partner. The SEC further alleged that the sales of partnership interests were unlawful because the interests were securities but no registration statement had been filed and no exemption was available.

The complaint asserted violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; and Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a). The SEC sought a temporary restraining order and preliminary and permanent injunctions prohibiting defendants from further violations of these securities laws and freezing defendants' assets to prevent the misappropriation or dissipation of investor funds. The SEC also sought an order requiring defendants to disgorge all ill-gotten gains or unjust enrichment and imposing civil penalties on defendants.

James Alexander Rue, William P. Hicks, Securities & Exchange Commission, Atlanta, GA, for Plaintiff.

Joseph Harvey Akers, Greenberg Traurig, Atlanta, GA, Mark Gerald Trigg, Robert Horowitz, PHV, Greenberg Traurig, New York, NY, for Defendants.

### ORDER

SHOOB, Senior District Judge.

On November 4, 2002, plaintiff Securities and Exchange Commission ("SEC") filed this action against Merchant Capital, LLC ("Merchant Capital"), and its principals, Steven C. Wyer and Kurt V. Beasley. The complaint alleged that defendants had raised approximately $20 million from more than 350 investors through a fraudulent scheme involving the sale of general partnership interests in Colorado registered limited liability partnerships, which

On November 7, 2002, a consent temporary restraining order was entered under which defendants, although denying any violations of the securities laws, agreed to stop selling interests in registered limited liability partnerships and to limit expenditures and transfers of their assets pending a hearing on the SEC's motion for a preliminary injunction.

On January 13–15, 2003, the Court conducted an evidentiary hearing on the request for a preliminary injunction. By

Order entered May 5, 2003, as amended by Order entered June 27, 2003, the Court denied the SEC's request for a preliminary injunction. After numerous extensions of time to complete discovery and to pursue settlement efforts, the case came on for trial before the Court sitting without a jury on January 18 and 20–21, 2005. Now, having considered the evidence presented both at trial and at the preliminary injunction hearing,[1] together with the submissions of counsel, the Court directs entry of final judgment in favor of defendants on the basis of the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Merchant Capital

Formed in July 2001, Merchant Capital is a Tennessee limited liability company with its principal office in Brentwood, Tennessee. (PIT. 35:22–23; Pl.Ex. 2, p. 19.)[2] Beginning in October 2001, Merchant Capital served as the organizing general partner and the elected managing general partner of twenty-eight Colorado registered limited liability partnerships ("RLLPs").[3] (PIT.35:13–17; PIT.43:14–18; Def.Ex.4.) Each of the partnerships is named "Evergreen High Yield RLLP," followed by a numerical designation. (PIT.45:16–18.) The Evergreen High Yield RLLPs were formed for the purpose of purchasing, collecting, and reselling consumer debt charged off by financial institutions. (Pl.Ex.2, pp. 2, 19; PIT.91:4–12.)

### II. Steven C. Wyer and Kurt V. Beasley

Steven C. Wyer is the Chief Manager of Merchant Capital. (PIT.33:22–23.) Kurt V. Beasley is the Secretary. (PIT.34:2.) Wyer owns 75% of Merchant Capital through an LLC, while Beasley owns the remaining 25% through another LLC. (PIT.34:14–23; PIT.164:4–15.)

Wyer has experience in the sales and marketing of financial services products and was a principal in the Chicago, Illinois, securities firm of Elwin, Wilbert and Hague. (PIT.50:22–51:1; Pl.Ex.3b.) Prior to forming Merchant Capital, Wyer was the President and CEO of Wyer Creative Communications, Inc., an integrated direct marketing company focused on the financial services industry. (PIT.51:8–12; Pl. Ex.3b). In 2000, Wyer filed for personal bankruptcy as a result of unpaid debts of Wyer Creative Communications that he had guaranteed. (PIT.51:18–52:7.)

Kurt Beasley has a law degree from Nashville School of Law and is a certified public accountant. Mr. Beasley is the founder of Beasley, Tyson & Altshuler, a law firm located in Brentwood, Tennessee. His law practice concentrates in areas of banking, asset protection, and general corporate representation. (Pl.Ex.3b.)

From the date of formation of Merchant Capital in 2001 through the date of trial, Wyer received total payments from the Merchant Capital business in the approximate amount of $900,000, and Beasley received total payments in the approximate amount of $268,000. (TT.256:22–257:3.)

### III. The Origin of Merchant Capital

Wyer and Beasley initially learned about the business of buying charged off consum-

---

**1.** Evidence admitted at the preliminary injunction hearing is part of the trial record. Fed.R.Civ.P. 65(a)(2).

**2.** "PIT." refers to the transcript of the preliminary injunction hearing. The trial transcript will be referred to as "TT." Exhibits admitted during the preliminary injunction hearing are referred to as "Pl.Ex." or "Def.Ex.," while trial exhibits are referred to as "T.Ex."

**3.** Although Merchant Capital is denominated as a "general partner," it does not have an equity participation in any of the RLLPs. (Pl. Ex. 2, p. 22; PIT. 575:22–576:2).

er credit card debt through Wyer's personal research, which began in early 2001. (PIT.35:6–9.) Prior to that time, neither Wyer nor Beasley had any debt collection experience. (PIT.545:17–24.) Wyer began his research on the Internet. He also read articles and interviewed people who were active in the industry. (PIT.546:8–16.)

In the spring of 2001, Wyer met Fred Howard, the principal owner of former relief defendant New Vision Financial, LLC ("New Vision").[4] (PIT.36:10–23.) Beasley later met Howard in the summer of 2001. (PIT.169:7–10.) Howard introduced Wyer to New Vision's business and to the industry generally. He told Wyer about the mechanism of the Colorado RLLP, how New Vision's business worked, and how New Vision's RLLPs were funded. (T.37:2–6.) At the time Wyer initially spoke with Howard, New Vision had already organized and managed more than fifty RLLPs. (PIT.37:21–23.) As of the date of the hearing in this action, New Vision had formed more than ninety RLLPs. (PIT.340:24–25).

Shortly after meeting Wyer, Howard supplied him with audited financial statements of New Vision's RLLPs that reflected their historical financial performance. (PIT.128:1–8; T.227:15–20.) Howard also supplied Wyer with a spreadsheet that showed New Vision's "break even" business model. (PIT.108:5–12; PIT. 324:13–23; PIT.567:16–24.) The model reflected the monthly target performance goals necessary for an RLLP to return 100% of the partners' capital contributions at the conclusion of the thirty-six month anticipated life of the RLLP, along with the projected partnership distributions. (PIT.474:6–18.) Howard told Wyer that the New Vision RLLPs that repurchased debt with proceeds from the sale of existing debt (the same model ultimately chosen by Merchant Capital) were performing consistent with the model. (PIT.567:25–568:3; PIT.228:8–11.)

After Beasley first discussed this new business opportunity with Wyer, he did extensive personal research regarding RLLPs. (PIT.169:18–22.) Beasley learned that both New Vision and another business in the industry, Collect America, used the RLLP structure. (PIT.492:5–12.) Beasley visited the offices of New Vision and met with Fred Howard and New Vision's legal counsel. He requested and received copies of various legal opinions from New Vision's counsel and spoke at length with New Vision's counsel regarding the structure of the RLLP, as well as the actual historical performance of the New Vision RLLPs. (PIT.492:23–493:6.)

Beasley spent the next several months learning as much as he could regarding RLLPs. He retained the Nashville firm of Baker, Donelson, Bearman & Caldwell and requested that firm's independent evaluation of the RLLP entity and the proposed structure of Merchant Capital's business. He specifically requested an analysis and evaluation from the firm regarding whether a Merchant Capital RLLP partnership interest should be considered a security. (PIT.493:9–22; Pl.Ex.17.) Merchant Capital received a formal legal opinion letter from Baker, Donelson stating that the Evergreen High–Yield RLLP partnership interest "should not be viewed as a security." (PIT.497:11–15; Pl.Ex.17.)

Merchant Capital also reviewed and relied upon several other legal opinions that were provided to Merchant Capital by New Vision's counsel. One of those opinion letters had previously been issued at the request of Collect America and similar-

---

4. The SEC named New Vision as a relief defendant solely for the purpose of obtaining an accounting. On January 16, 2003, following submission of the required accounting, the Court entered an Order concluding New Vision's involvement in the case.

ly opined that RLLPs were not subject to the federal securities laws. (PIT.494:3–16; Def.Ex. 7.) A third opinion letter reviewed by Merchant Capital dated May 25, 2001, from a Florida law firm further confirmed the opinion that an RLLP was not subject to the federal securities laws. (PIT. 494:25–495:21; Def.Ex.8.)

New Vision's counsel also provided Merchant Capital with an opinion letter from the Houston office of the law firm of Chamberlain, Hrdlicka, White, Williams & Martin. (Def.Ex.9). That opinion letter, dated May 31, 2001, opined that RLLP partnership interests "are not securities under the Texas Securities Act." (PIT495:22–496:16; Def.Ex.9.)

Finally, New Vision provided Merchant Capital with a "no-action" letter from the State of Texas, in which the staff of the Texas State Securities Board took a "no-action" position on the issuance of partnership interests in a general partnership entity formed to buy and collect receivables of small businesses, thereby concluding that the partnership interests were not securities. (PIT.496:12–22; Def.Ex.6.)

Beasley reviewed, evaluated, and relied upon these legal opinion letters when deciding to use the RLLP structure in connection with Merchant Capital's business. (PIT.491:9–12; PIT.496:23–25.)

## IV. The Market for Charged–Off Credit Card Debt

When an unsecured consumer account has been in default for a determined period of time (approximately 180 days), the internal policy of many national credit grantors requires that the account be charged off of the issuer's financial statements. (Pl.Ex.2, p. 2.) Once the account is charged off, the issuer can continue to attempt collection efforts, but because the collection process has evolved into a unique time and labor intensive process, many credit grantors choose to sell all or portions of this charged-off debt. (Id.)

This charged off debt is known in the industry as "fresh debt." Fresh debt is debt that is purchased directly from the credit card issuer after it is charged off by the issuer, usually after 180 days of unsuccessful collection history. (PIT.549:6–9.) "Secondary debt" is debt that has been worked by one collection agency and is then offered for sale a second time. (PIT. 549:10–14.) "Tertiary debt" is debt that has been worked by two collection agencies and is offered for sale for the third time. (PIT.549:15, 16.) "Quad debt" is debt that has been worked by three collection agencies and is then offered for sale for a fourth time. (PIT.549:17–19.) The cost per dollar of the debt generally becomes lower as the debt moves from fresh to secondary to tertiary to "quad." (PIT. 549:20–23.)

Typically, credit card issuers pool fresh delinquent credit card debt and either sell it at auction or sell it to companies that purchase it pursuant to "forward flow contracts" (contracts that obligate the credit card issuer to sell periodically, and the company to purchase periodically, a certain minimum amount of debt at agreed-upon pricing) or pursuant to single sale contracts. (PIT.67:7–17.) "Fresh debt" files can be purchased from credit card issuers with face values that range from less than $25,000 per file (or "pool") to as large as $35,000,000 per file. (PIT.339:16–340:16; PIT.398:7–8; PIT.399:1–7; PIT. 561:5–7.)

Purchasers of debt are also able to purchase debt known as "in-house returns." (PIT.400:22–401:4.) These files, which consist of accounts in which the debtors have breached payment plan agreements directly with the issuer, can be purchased from debt issuers in small face amounts. (PIT. 400:10–21.) Secondary, tertiary and "quad"

debt can be purchased at virtually any face amount. (PIT.403:8–12.)

Banks also have what are called "one-off sales," in which they sell "fresh" debt files that remain after they have sold larger debt pools to their forward-flow contract purchasers. (PIT.410:4–13.) In these "one-off sales," the debt files sold directly by the bank may be offered for sale for as little as $25,000. (PIT.410:4–13; PIT. 561:5–7.)

## V. *Returns Anticipated to be Generated by the Merchant Capital RLLPs*

Each RLLP is limited to no more than twenty partners. (Pl.Ex.2, p. 2.) There are approximately 485 partners in the twenty-eight RLLPs. (PIT.43:19–20.) The minimum capital contribution permitted from a partner in an RLLP was $25,000. The maximum capital contribution permitted was $3,000,000. (Pl.Ex.2, p. 4.) Approximately $26,000,000 of capital contributions were made by the partners during the period from the formation of the first RLLP in October 2001 through the funding of the last RLLP in November 2002. (PIT.35:22–24; PIT.43:13–22.)

Each Merchant Capital RLLP contemplates a thirty-six month life of the business, with the partners having the option of a projected 3.6 percent quarterly return or, alternatively, a projected deferred annual return of 16.5 percent, which is paid upon the termination of the partnership at month 37. (PIT.566:2–7.) The RLLP contemplates the return of all of the partners' capital contributions at the conclusion of the thirty-six month period, in addition to the quarterly or deferred annual return. (PIT.556:8–11.)

These high returns, 14.4 percent in the case of quarterly returns or 16.5 percent in the case of a deferred annual return, reflect the level of risk that is inherent in the business. (PIT.566:12–18.) Merchant Capital never guaranteed these rates of re-

turn, or any rates of return, to any of the prospective partners. (PIT. 566: 21–23.) In fact, Merchant Capital specifically advised the prospective partners that these rates of return might not be achieved. (PIT.566:24–567:5.)

In the partnership application, Merchant Capital expressly advised prospective partners of the risks associated with the business and the fact that the businesses might not perform as anticipated:

> *Applicants are advised that there are SIGNIFICANT RISKS involved in the buying and subsequent collection of charged-off debt. As a result, becoming a General Partner is only appropriate for those persons capable of withstanding the risk of losing their entire capital contribution. While the Organizing General Partner is confident that it has done its very best to mitigate these risks and to develop adequate contingency plans, it can offer no guarantees.*
>
> 1. *The actual rate of recovery for the collection of the purchased debt may be higher or lower than projected. In fact, there are no assurances that any amount, for a specific pool(s) of debt purchased, can actually be recovered. Further, the actual amount of time necessary to recover an acceptable return may be so long as to materially reduce any rate of return.*
>
> . . . . .
>
> 3. *An economic downturn of any serious proportion or a national crisis could adversely affect the ability to collect on a timely basis.*

(Pl.Ex.2, p. 10.)(Emphasis in original.)

## VI. *Structure of the RLLPs*

### A. *Merchant Capital's Role as Organizing General Partner*

Prior to the election of a managing general partner by each RLLP, Merchant

Capital served as the organizing general partner for each RLLP. This fact was disclosed to the prospective partners in the partnership application. (PIT.574:8–12.)

As the organizing general partner, Merchant Capital performed all of the clerical and administrative duties associated with preparing and distributing the partnership application documents. (PIT.576:5–9.) Merchant Capital also provided its network of financial professionals throughout the country the information and materials necessary to present the RLLP business opportunity to their respective clients. (PIT.576:10–14.) Merchant Capital was also responsible for locating and training these recruiters, most of whom were CPAs, attorneys, insurance professionals, and annuities professionals. (PIT.576:18–25.)

Merchant Capital entered into written agreements with each of its recruiters. (PIT.577:2–3.) Merchant Capital required each of its recruiters to agree that under no circumstances would they make the following representations to any prospective partner:

a. That an RLLP is "guaranteed."

b. That an RLLP is "safe" and/or "without risk."

c. That an RLLP has been "approved" by any state or federal regulatory organization.

d. That your efforts are for the "sale of" or "solicitation of offers to buy."

e. That the RLLP is an "investment contract."

f. That the RLLP represents an indebtedness, profit-sharing arrangement or certificate, or another form of investment security.

g. That the RLLP represents the "selling" of "partnership interests" to "investors" or "soliciting" "subscribers" to make passive "investments" by "subscribing for" and "buying"

"units of Partnership interests" for "proceeds of sale."

h. That the RLLP will pay "dividends" or that "interest" can be paid on the "principal" of "investment funds."

i. That the RLLP is an "investment security."

(PIT.578:7–579:9; Gristy Dep., Def.Ex.1.)

Merchant Capital was further responsible for establishing the escrow relationship with U.S. Bank and for establishing the specific escrow accounts for each RLLP and performing the associated clerical and administrative duties. (PIT.576:14–17.)

As the organizing general partner, Merchant Capital received a fee of fifteen percent (15%) of the total capital contributions. (PIT.56:3–7; Pl.Ex.2, p. 3.) From that fifteen percent (15%) fee, Merchant Capital then paid commissions to the "recruiters" who introduced the partners to Merchant Capital. These commissions ranged from seven percent (7%) to eleven percent (11%) of the total capital contributions made by each partner. (PIT.56:8–19.) The remainder was used to fund Merchant Capital's ongoing business.

## B. *Role of the Partners*

Section 7.2 of the RLLP partnership agreement defines the role of the partners:

**Management.** The participation in this RLLP is not a passive involvement. The General Partners themselves will manage the RLLP. Each and every General Partner is required to actively participate in important business decisions affecting the RLLP by exercising its voting privileges. Each General Partner may be required to participate in one or more committees, which shall oversee and conduct important business.

These committees may include the following: Accounting and Audit; Legal

Oversight; Planning, Budget, and Finance; and Debt Pool Acquisition.

By establishing the above committees, each General Partner will have the opportunity to be involved in the day-to-day management of the business of the RLLP and have meaningful input by utilizing both personal and business expertise and experience in the performance of partnership duties, even if located some distance from the RLLP's place of business. Thus, each General Partner will have *active control* of the RLLP's affairs. The RLLP will hold formal and informal committee and RLLP meetings at various geographic locations, including the offices of the RLLP's place of business. All meetings will be open to attendance by all General Partners either in person, by conference telephone, by video teleconference, or otherwise.

(Pl.Ex.2, p. 29.)(Emphasis in original.)

Each of the partners makes a specific representation that he or she understands the need to actively participate in the business affairs of the RLLP and agrees to do so:

Each General Partner represents that it understands that the success of the RLLP's business will depend upon the *active participation and involvement in RLLP matters by all General Partners.* Each General Partner undertakes and agrees to devote such time and energy as is reasonably necessary to assist in the management of the RLLP's business and use its best efforts to participate in RLLP meetings and actions by written consent.

(Pl.Ex.2, p. 29.)(Emphasis in original.)

Although the partnerships have contracted with Merchant Capital to have some of the management functions performed by Merchant Capital and by persons with whom Merchant Capital contracts, the partnership agreement is clear that Merchant Capital does not have the authority to manage the partnership. The partnership agreement makes it clear that only the partners have authority to manage the business, and with respect to the primary partnership decision, the purchase and sale of debt, Merchant Capital is expressly prohibited from acting without the approval of two-thirds of the partners in each partnership.

The partnership agreement expressly reserves to the partners the following powers: (i) the ability to call meetings for any purpose and to hold regular quarterly meetings (Pl.Ex.2, Section 7.9); (ii) the ability to control the managing general partner by requiring a two-thirds vote of the units in the partnership to permit the managing general partner to enter into any obligation in excess of $5,000 or incur any expenses in excess of $5,000 per month (Pl.Ex.2, Section 7.6) (PIT.83:21–84:1); (iii) the ability to participate in one or more committees (Pl.Ex.2, Section 7.2); (iv) the ability to elect a managing general partner and to remove the managing general partner by a two-thirds vote of the units if the managing general partner materially fails to carry out its duties (Pl.Ex.2, Section 7.8); (v) the ability to inspect all of the books and records of the general partnership (Pl.Ex.2, Section 12.6); (vi) the ability to approve additional funding after the initial closing of the partnership by a two-thirds vote of the units of the partnership (Pl.Ex.2, Section 4.3); and (vii) the ability to amend the partnership agreement by either a two-thirds or unanimous vote depending on the type of amendment (Pl.Ex.2, Sections 7.1, 13.1 and 13.3). The partners also have the ability to dissolve the partnership prior to the original stated term. (Pl.Ex.2, Section 9.1.)

Merchant Capital advised all of its prospective partners that the RLLPs are not securities and are not registered with the

SEC. (PIT.498:10–13; Pl.Ex.2, front cover.) This disclosure was made based upon Merchant Capital's own research and upon the legal opinion letters that Merchant Capital had reviewed. (PIT.499:12–16.)

Most of the partners were introduced to Merchant Capital through existing relationships that the partners had with financial professionals who also served as "recruiters" for Merchant Capital. (T.54:21–55:1.) RLLP partners were not required to have any prior debt collection experience. (PIT.47:19–21.) Nor were they required to be "accredited investors." (PIT.47:15–18.)

Prospective Merchant Capital RLLP partners applied for the partnership by filling out an application form that was contained in the partnership application packet. (PIT.44:5–21; Pl.Ex.2.) The application packet that a prospective partner received contained general information regarding the RLLPs, information regarding the consumer debt collection industry in the United States, a description of the relationship of the entities involved, a form of a Colorado registration form, a form of certificate of general partnership, a ballot for the election of managing general partner, the partnership agreement, the partnership agreement signature page, a Colorado RLLP registration statement, a questionnaire seeking individual applicant information, a wire transfer deposit authorization, and other information. (Pl. Ex.2, pp. 1–50.)

Along with his or her completed application, a prospective partner submitted a ballot indicating its choice for managing general partner. Merchant Capital informed the partners that it was qualified to serve in that capacity but did not require the partners to vote for it. (PIT.58:8–16; Pl.Ex.2, p. 14.) The evidence is in dispute as to whether any partner ever voted for anyone other than Merchant Capital. (PIT.58:25–59:1; PIT. 305:22–25.) Regardless, Merchant Capital

was elected by a two-thirds majority of each of the twenty-eight RLLPs to serve in that capacity. (PIT.58:23–59:6.)

At the time each RLLP was closed, Merchant Capital provided the partners with a list of the names, city of residence, and degree of equity participation of each of the other partners. The evidence is in dispute at to whether partners were also provided the addresses and telephone numbers of each of the other partners, but this information was available upon request. (PIT.593:15–20; Richter Dep., p. 23, Ex. 200; Johnston Dep., p. 14, Ex. 151.)

The actual degree of each partner's involvement in the business of the RLLPs varies greatly, depending on the extent to which the partner chooses to exercise the managerial powers reserved to the partners in the partnership agreement. Some of the partners are extremely active, while others have minimal participation. (PIT.77:3–7.)

Each RLLP has quarterly meetings in which the partners are invited to participate. The first quarterly meeting of each RLLP was scheduled approximately three months after the closing of the partnership. (PIT.81:16–23.) During the course of the quarterly meeting, the partners are provided additional information regarding their monthly statements and any questions that the partners have are answered. (PIT.81:25–82:1.)

The partners have all of the information necessary to perform the same analysis that Merchant Capital performs in evaluating the potential purchase or sale of debt. (PIT.586:10–12.) The monthly statements that the partners receive, coupled with the ballots that are sent to the partners, provide the partners with the name of every pool of debt in which they own an interest, the date that the interest was purchased, the length of time that the RLLP has held

the interest, and both the historical gross and net collections from the debt. (PIT. 586:10–24.) In addition, all the partners have complete access to the RLLP's books and records in accordance with the express terms of the RLLP's partnership agreement. (PIT.586:25–587:2; Pl.Ex.2, p. 9.)

The partners frequently request information from Merchant Capital related to the business of the RLLP. (PIT.587:21–588:1.) Merchant Capital generally complies with such requests. (PIT.588:2–5.) Only two partners have ever complained to Merchant Capital about an alleged failure to provide requested information. (PIT. 600:1–6; Reiter Dep. 30–32, 35–37, 44–50, Ex. 18, 22; TT.387:14–20.)

The partners are capable of affording and understanding the risk associated with the business of the RLLPs. Steven Wyer testified that Merchant Capital instructed its recruiters to look for potential partners who had a minimum net worth of $250,000 with good general business knowledge and experience, and who were willing to actively participate in the management of the business of the RLLP. (PIT.579:14–19.)

Each partner has a net worth of at least $250,000 and more than 75% of the partners reported net worth in excess of $500,000. (PIT. 579:20,21; 596:2–25.) A significant number of the partners have a net worth in excess of $1,000,000. (PIT. 596:11–23.) Ninety percent (90%) of the partners reported that their business experience ranged from "average" to "excellent." (PIT.597:1–4.)

The Court finds that the partners have the ability to actively participate in the management of the business of the RLLPs. The RLLP partnership agreement does not leave so little power in the hands of the partners that the arrangement distributes power as would a limited partnership. The partners are not so inexperienced and unknowledgeable in business affairs that they are incapable of intelligently exercising their partnership powers.

### C. Merchant Capital's Role as Managing General Partner

Each RLLP was free to elect any person or entity that it chose to serve as its managing general partner. (PIT.574:16–17.) Each RLLP initially chose to elect Merchant Capital as its managing general partner. (T.574:13–15.) In August 2004, RLLP 19 chose to replace Merchant Capital as its managing general partner and was successful in doing so. (TT.420:1–11.) Merchant Capital has no equity interest in any of the RLLPs and has no voting power. (PIT.575:22–576:4.)

In its role as managing general partner, Merchant Capital acts as the business manager responsible for facilitating the conduct of the day-to-day business affairs of the RLLPs and is otherwise responsible for managing the organization and administrative duties of the RLLPs.

Section 7.3 of the partnership agreement provides the following disclosures regarding the role of the managing general partner:

> The General Partners recognize that it is in the interest of the RLLP and the General Partners to facilitate the conduct of day-to-day business affairs of the RLLP by designating and appointing a Managing General Partner as the business manager. The Managing General Partner shall be elected by General Partners as they are accepted into the Partnership. The Managing General Partner shall be responsible for managing the organization and administrative duties of the RLLP. The Managing General Partner shall be obligated to devote its best efforts on a non-exclusive basis to the RLLP affairs.

(PIT.582:12–25; Pl.Ex.2, p. 29.)

As the business manager for an RLLP, Merchant Capital is responsible for a wide

range of duties, which include locating, evaluating, and negotiating with potential third-party vendors, administering the relationship with the third-party escrow agent, reconciling financial accounts and records, making recommendations regarding the purchase and sale of debt to the partners, facilitating the ballot process for the proposed purchase and sale of debt, reporting to the partners, as well as monitoring the collection activity of the debt assets owned by the RLLP. (PIT.583:8–584:11.)

Merchant Capital is also responsible for evaluating the recommendations it receives from third-party vendors regarding potential purchases and sales of debt. (PIT.584:12–15.) When a third-party vender provides Merchant Capital with information regarding potential debt purchases, Merchant Capital provides all the information to the partners. (PIT.560:3–9.) Merchant Capital does not withhold any information from the partners. (PIT.585:17–586:3.)

Merchant Capital could easily be replaced as managing general partner as there are many other people and entities in the industry who have the requisite ability. (PIT.395:16–23.) Indeed, Merchant Capital has been approached by others who have expressed an interest in serving as a managing general partner for an RLLP. (PIT.574:18–575:20.) In addition, the members of the Debt Buyers' Association, a trade association, include hundreds of industry participants, many of whom would be capable of serving as the managing general partner of an RLLP. (PIT.547:7–548:19.)

Extensive experience in the delinquent credit card debt business is not necessary for one to become a managing general partner of an RLLP. Neither Wyer nor Beasley had any previous debt collection experience prior to forming Merchant Capital (PIT.36:3–5), and Wyer became knowledgeable enough to function as a managing general partner in as few as thirty days. (PIT.546:17–23.) The partnerships could operate profitably without Merchant Capital or any other managing general partner if the partners would take the necessary time and effort to educate themselves and fulfill the role and function of the managing general partner. (PIT.548:20–23.) Indeed, even one of plaintiff's expert witnesses, Louise Epstein, testified that it is possible for someone with limited capital and absolutely no experience in the debt-buying business to operate a business profitably. (TT.232:21–233:7.)

Defendant Wyer testified that in August 2004, RLLP 19 terminated Merchant Capital as its managing general partner and requested that all of its assets, including its capital and its specific individual debt files, be returned to it. (TT.420:1–11.) Merchant was in fact capable of complying with the partnership's request in that regard. (TT.420:12–13.)

Merchant was capable of physically returning all of the partnership's assets by using the "N-select" process to identify and deliver the specific individual debt files. Merchant also returned the original partnership book, all of the partnership subscription documents, all of the information relating to tax filings and all other ancillary correspondence between any of the partners and Merchant Capital during Merchant's term as the partnership's managing general partner. (TT.420:14–22.)

In response to the RLLP's request for recommendations of other potential managing general partners, Merchant Capital provided the partnership with a list of six potential companies. (TT.421:1–13.) The partnership thanked Merchant Capital for its assistance and cooperation in facilitating the partnership's decision to replace Merchant with another managing general partner of its own selection. (TT.421:14–

19.) The SEC offered no evidence to contradict or otherwise dispute Mr. Wyer's testimony in this regard.

The Court finds that Merchant Capital has properly performed its duties and responsibilities as managing general partner of the RLLPs. The Court further finds that the partners are not so dependent upon some unique entrepreneurial or managerial ability of Merchant Capital that they could not replace the managing general partner or otherwise exercise meaningful partnership powers without the managing general partner.

### D. *Role of Third Party Vendors*

Merchant Capital makes it clear in the RLLP partnership application that it will rely heavily on outside vendors: "If elected [managing general partner], Merchant Capital, LLC, shall contract, retain, and oversee relationships with one or more outside vendors who will assist the Partnership in analyzing, purchasing, selling, and managing the debt assets of the RLLP." (Pl.Ex.2, p. 5; PIT. 384:7–22.)

### VII. *The RLLPs' Business Operations*

When charged-off debt becomes available for purchase in the marketplace, third-party vendors with whom Merchant Capital has contracted notify Merchant Capital of the basic terms regarding the potential debt purchase. (PIT. 396:14–397:7; Def.Ex.2.) Merchant Capital, as the elected managing general partner of the RLLPs (other than RLLP 19 since August 2004), then notifies the RLLPs that have funds available to purchase debt of the opportunity and transmits the information from the third-party vendor directly to each of the partners by way of a ballot. (PIT.585:17–586:3.)

The partners are generally given ten (10) days to return their ballots by mail or facsimile to approve or reject a proposed debt purchase. (Def.Ex.10.) Pursuant to the partnership agreement, a partner who fails to vote within that time frame is deemed to have given his or her power of attorney to the managing general partner with respect to the debt purchase at issue. (Def.Ex.10; Pl.Ex.2, p. 28.)

The SEC alleges that the Merchant Capital balloting process is, in effect, a sham. In support of this contention, the SEC offered the testimony of Sheridan Towers, an accountant employed by Lawrence J. Warfield, the Receiver for One Vision Children's Foundation.[5] Mr. Towers testified that he had reviewed financial records and ballots related to the five RLLPs in which One Vision had partnership interests.[6] Mr. Towers testified that based upon his review of approximately 260 ballots, there were thirty ballots in which Merchant purchased more debt than was authorized on the ballot. (TT.109:9–12.) Mr. Towers confirmed on cross-examination, however, that while the total purchase price may have exceeded the amount authorized in the ballot on those occasions, the specific price actually paid for the portfolios at issue never exceeded the price

---

**5.** One Vision was a 501(c)(3) organization that raised approximately $4.3 million through the sale of charitable gift annuities, primarily to elderly individuals. (TT.278:22–279:24.) One Vision used approximately $1.176 million of that amount to purchase partnership interests in five Merchant Capital RLLPs. (TT.282:9–15.)

**6.** Defendants objected to Mr. Towers' testimony on the grounds that it was beyond the scope of his testimony as designated in the pretrial order. (TT.104:21–105:14.). The Court reserved ruling on this objection. (TT.105:18–21.) Although Mr. Towers' testimony may be beyond the scope of the SEC's designation in the pretrial order, the Court finds that defendants will not be unfairly prejudiced by its admission. Therefore, the Court will consider it.

which was authorized by the ballots. (For example, if the ballot authorized the purchase of a specific portfolio at six cents on the dollar, the actual purchase price never exceeded the authorized ballot price.) (TT.149:6–17.) Accordingly, while the gross amount of the purchase may have been increased on occasion, the price per dollar that was authorized by the ballot was always followed. (TT.149:15–17.)

Mr. Towers also testified that there were six instances in which debt purchases were made prior to the ballots being sent out seeking authorization for those purchases, and seventy-three examples of debt purchases having been made prior to the expiration of the ballot response deadline. (TT. 118:9–17; 122:12–20.) On cross-examination, Mr. Towers admitted that the Merchant Capital partnership agreement does not mandate a ten-day response period to a ballot solicitation. (TT.145:13–16.) Mr. Towers further admitted that he found no instance in which the general partners ultimately disapproved of any debt purchase that may have been made prematurely. (TT.145:17–5.) Mr. Towers also conceded that he had made no effort to determine what processes or options were available to Merchant Capital to recall a purchase in the event that the ballots subsequently disapproved of a specific purchase. (TT.146:6–10.)

Significantly, Mr. Towers also confirmed that many of the bank transfers he was relying upon to opine that debt purchases were made early were made into a "zero account." (TT.146:20–147:6.) Mr. Towers was unable to make a determination that when funds were transferred from the RLLP account to another escrow account, those funds were immediately used to purchase debt, as opposed to remaining in that escrow account for some additional period of time. (TT.147:7–22.)

Mr. Towers further testified that the monthly partnership statements that were sent to all of the Merchant Capital general partners accurately reflected the actual debt portfolio purchases that had been made in the previous month on the partnerships' behalf. (TT.147:23–148:20.) None of the debt purchases were hidden or disguised from the general partners. (TT.147:15–20.) Mr. Towers also testified that he had not reviewed any records subsequent to September 2003, and that he was therefore unaware of any practices or procedures that may have been improved since that date. (TT.151:2–6.) He did acknowledge that he was aware that Merchant Capital had instituted a procedure by which general partners could vote over the telephone. (TT.151:7–11.)

The Court finds that Mr. Towers' testimony failed to show that the Merchant Capital balloting procedure is a sham.

As of the date of the preliminary injunction hearing, each of the purchases made by a Merchant Capital RLLP had been the purchase of an individual interest in a larger debt pool. The RLLPs have the ability, however, to purchase 100% interests in smaller debt pools, using only the capital of their own RLLP. (PIT.394:24–395:3; PIT.395:4–9; PIT.498:7–9; PIT.560:14–21; PIT.561:14–17.)

Upon the RLLP's purchase of the debt, the managing general partner, through its contractual relationship with third-party vendors, places the debt for collection with third-party collection agencies. (PIT.35:18–21; Pl.Ex.2, p. 2.) The RLLPs generally try to collect on the debt for approximately 12–18 months.

When the third-party debt collection agency collects debt, the collection agency generally deducts its fee, which is disclosed in the partnership agreement, from the gross collections, and then deposits the net balance of the collections into an escrow account maintained by the agency. (PIT.177:13–15; PIT.93:4–14.) The funds

are then transferred to the third-party vendor who contracts with the collection agency. The third-party vendor, in turn, remits the funds owned by the Merchant Capital RLLPs to Merchant Capital. (PIT.93:4–14.)

Once Merchant Capital receives the funds, it provides U.S. Bank with directions for distributing the funds into each of the respective RLLPs' escrow accounts in an amount that accurately reflects each RLLP's ownership interest in the debt at issue. (PIT.94:14–17.) Then Merchant Capital directs U.S. Bank to distribute the fees that are disclosed in the partnership agreement to Merchant Capital and to the third-party vendor. (PIT.96:10–12.) The remaining funds are then used by the RLLPs to either fund the quarterly distributions or for reinvestment in additional debt purchases. (PIT.94:18–21.)

The RLLPs' business model assumes that, at the conclusion of twelve to eighteen months, the RLLP, again by a vote of two-thirds of its partners, will sell the debt in the secondary market. (PIT.90:17–91:3.) The cash collections and the proceeds from the sale of the debt into the secondary market are then used to purchase additional debt if such purchases are approved by a two-thirds vote of the RLLP's partners. (PIT.93:4–14.)

Each RLLP has a projected three-year term, after which its assets (credit card debt) are liquidated and the cash is then distributed to the partners, unless its term is extended by a two-thirds vote of its partners. (Pl.Ex.2, p. 33.)

## VIII. *Role of New Vision*

New Vision Financial was initially one of Merchant Capital's outside vendors (PIT. 384:23–385:3), but not the only one. (PIT. 550:22–24; PIT.564:19–20; PIT.564:18–21; PIT.564:22–565:2.) New Vision purchased pools of fresh credit card debt from is-

suers. It then offered percentage interests in those pools for sale to various purchasers, including any of the Merchant RLLPs whose general partners authorized such purchases. New Vision contracted with a third-party collection agency that collected the debt and remitted the proceeds to New Vision. New Vision then remitted the proceeds to the owners of the debt according to their ownership interest in the debt.

During calendar year 2002, Merchant Capital RLLPs accounted for approximately 20–25% of New Vision's business. (PIT.410:16–21.) There was a small period of time during which Merchant Capital was among the two largest purchasers of debt from New Vision. (PIT.388:17–23.) New Vision sold debt to a number of companies other than Merchant Capital. (PIT.389:1–5.)

New Vision drew upon its experience in the industry as it undertook to analyze debt purchase opportunities for the Merchant Capital RLLPs. It evaluated overall liquidation rates over a given period of time, as well as the historical selling price for a given type of debt. (PIT.385:4–14.)

When a debt issuer decided to offer a debt file for sale, it provided New Vision with a spreadsheet that contained a variety of entries, such as the individual debtors' names, addresses, phone numbers, Social Security numbers, payment history, credit extension dates and locations of the accounts. (PIT.385:15–386:1). New Vision did not share this information with Merchant Capital. (PIT.396:10–13). The only information that New Vision shared with Merchant Capital regarding a potential debt purchase was the name of the issuer, the month, the number of accounts, the price and the principal balance of the file, along with an indication of what kind of debt the file represented. (PIT.396:14–397:7; Def.Ex.2.)

Once New Vision had conducted its initial analysis of whether a debt pool offered by a bank presented a potentially attractive purchase opportunity, New Vision generally shared that opinion with Merchant Capital. (PIT.386:17–21). Merchant Capital was not bound, however, to accept New Vision's recommendations (PIT.386:22–24), and there were occasions when Merchant Capital rejected New Vision's recommendations. (PIT.387:6–10.)

Merchant Capital was under no obligation to purchase any debt from New Vision. (PIT.387:18–20.) New Vision acknowledged that Merchant Capital was free to purchase debt from companies other than New Vision. (PIT.389:8–10.)

New Vision was also one of the third-party vendors that assisted Merchant Capital in connection with the management of the RLLPs' debt assets. (PIT.389:19–25.) New Vision monitored the monthly collection activities regarding the debt assets that it had purchased on behalf of the Merchant Capital RLLPs. (PIT.390:1–5.) The actual collection results were shared with Merchant Capital through monthly statements, which reflected collections on a file-by-file basis. (PIT.390:19–25.)

New Vision was also one of the third-party vendors that assisted Merchant Capital by advising Merchant Capital regarding the time to sell debt assets and the pricing of those assets at the time of sale. (PIT.392:4–7.) New Vision did this by monitoring the collection activity of particular assets and placing assets on the market for competitive bidding. (PIT.392:8–25). According to Fred Howard, there are many potential buyers of debt on the secondary market. (PIT.392:22–25.)

New Vision had to remain competitive in the marketplace with respect to the services it provided and the fees it charged in order to retain Merchant Capital's business. (PIT. 389:15–18; PIT.326:14–19.)

New Vision didn't manage the RLLPs. New Vision was a service provider pursuant to a written service contract with Merchant Capital. New Vision had no authority to take any action whatsoever on behalf of the RLLPs and, in fact, had no contractual relationship with the RLLPs. Only the partners of each RLLP can authorize the purchase or sale of debt. Although New Vision managed the collection process with respect to the majority of the debt pools in which the RLLPs had an ownership interest, the RLLPs maintained the power to take over the collection process at any time if they so chose. The RLLPs also had the ability to liquidate their interests in any debt pools in which they participated.

Throughout the spring of 2003, Merchant Capital purchased most of its debt through New Vision because New Vision had generally obtained good results for Merchant Capital, and because it takes time to establish a good working relationship with a third-party vendor. (PIT. 552:2–8.) There was no financial benefit to Merchant Capital in recommending debt offered by New Vision as opposed to debt being offered by some other company. (PIT.552:18–21.)

The Merchant Capital RLLPs have also purchased debt from BAF Holdings. (PIT.550:23–551:4.) Merchant Capital began looking for other third-party vendors from whom to purchase debt in March 2001. (PIT.564:2–6.) Wyer first approached BAF Holdings in August and September 2002, before this action was filed. (PIT.564:18–21.) Merchant Capital began purchasing debt from BAF Holdings in December 2002. (PIT.563:19–20.)

BAF Holdings did not purchase its debt from credit card issuers pursuant to forward-flow contracts. (PIT.553:7–9.) It purchased debt pursuant to one or more single sale contracts. (PIT.553:10–16.) The debt that was purchased through BAF

Holdings was identical in characteristics and price to the debt purchased through New Vision and its forward-flow contracts. (PIT.553:17–554:3.)

Merchant Capital also had discussions with Collins Financial regarding the prospect of a third-party vendor relationship. (PIT.564:22–565:2.) Those discussions also began in March 2001. (PIT.565:4–13.) The proposed relationship was a comprehensive one, in which Collins Financial would provide all of the services Merchant Capital had obtained from New Vision. (PIT. 565:14–21.)

In September of 2002, Merchant Capital decided to replace New Vision with Trilogy Capital Management. (TT.249:18–23.) The contract between Merchant Capital and Trilogy was entered into on or about January 2, 2003. (TT.251:10–19.) When Trilogy became the new third-party vendor, Merchant Capital was able to cut the third-party vendor fees in half. Where New Vision had been charging a fourteen percent (14%) sales fee, Trilogy charged only seven percent (7%). (TT.250:14–23.) In November 2003, Merchant Capital balloted the general partners to seek their permission to replace Trilogy with Merchant Management, an affiliated entity, to perform the third-party vendor services. (TT. 249:18–250:2; 251:2–6.) Upon receiving that permission and assuming its role, Merchant Management adopted the same fee structure that had been used by Trilogy. (TT.250:24–251:1.)

The Court finds that the nature of Merchant Capital's relationship with third-party vendors generally, and with New Vision in particular, is appropriately disclosed in the partnership application and agreement. Although Merchant Capital primarily used the services of New Vision as its third-party vendor through early 2003, Merchant Capital did not use New Vision exclusively, nor was it required to do so.

The Court further finds that the Merchant Capital RLLPs are not dependent upon any unique managerial or entrepreneurial skills or abilities of New Vision. When this case was initiated by the SEC, it contended that the Merchant Capital RLLPs were completely dependent upon New Vision. Since this litigation was filed, New Vision was replaced by Trilogy Capital Management, which was then itself replaced by Merchant Management. The undisputed fact that the RLLPs were capable of changing their third-party vendors (on two separate occasions) establishes that the partnerships are not dependent upon any unique managerial or entrepreneurial skills of New Vision or any other third-party vendor.

### IX. An RLLP's Ability to Control Its Interest In a Debt Pool

The SEC has contended that the Merchant Capital RLLPs have to purchase fractionalized interests in larger pools of debt to be profitable, and that ownership of fractional interests affords them no meaningful ability to manage or control their assets. The Court finds that this is not the case.

### A. The RLLPs Do Not Need To Purchase Fractionalized Interests In Large Debt Pools To Be Profitable.

The ability of a Merchant Capital RLLP to be successful is not dependent upon its purchasing fractionalized interests in larger pools of debt as opposed to purchasing 100% of smaller debt pools. (PIT.394:24–395:3.) In fact, Mr. Howard testified that it is "absolutely" possible for an RLLP to be just as successful purchasing 100% of a $1,000,000 debt pool as it would be if it purchased a ten (10%) percent fractionalized interest in a $10,000,000 debt pool. (PIT.395:4–9.)

Mr. Beasley also testified that it is not necessary for an RLLP to pool its funds with other entities in order to conduct its business profitably. (PIT.498:7–9.) This fact was further confirmed by Mr. Wyer, who testified that the Merchant Capital RLLPs do not need to pool their capital in order to engage in their business. (PIT. 560:14–21.)

One of the SEC's own expert witnesses at trial, Louise Epstein, testified that it is possible for a partnership to purchase debt at a retail price and potentially make a profit from the collection and resale of that debt, even if the partnership had limited capital available to it and no previous experience in the debt-buying business. (TT.232:13–233:7.)

Accordingly, the Court finds that it is not necessary for a partnership to purchase fractionalized interests in large debt pools in order to be profitable.

## B. *Each RLLP Has Control Over Its Fractionalized Interest.*

Defendants offered testimony from four witnesses to demonstrate that a Merchant Capital RLLP has the ability to liquidate its fractionalized interest in a larger debt pool at any time and therefore has the ability to manage and control its assets. The SEC cross-examined Fred Howard, Steve Wyer, Kurt Beasley, and Kenneth Hall regarding their testimony on this issue.

Fred Howard of New Vision testified that if at any time a particular Merchant Capital RLLP wanted to liquidate its fractional interest in a larger debt pool, it could (PIT.391:16–19; PIT.436:5–11); that if a Merchant Capital RLLP was not satisfied with the collection performance of a particular debt file, it could take possession of its fractionalized interest from that debt pool and place it with another collection agency (PIT.391:20–25.); and that if a Merchant Capital RLLP was not satisfied with the performance of a particular debt pool in which it owned a fractionalized interest, the RLLP could take possession of its fractionalized interest from the larger pool and sell it. (PIT.393:5–10.) In fact, New Vision has permitted Merchant Capital RLLPs to liquidate their fractionalized interests in debt pools in the past. (PIT. 416:5–12.)

Mr. Wyer also testified that the fact that an RLLP owns a percentage interest in a debt pool as opposed to an entire debt pool does not adversely impact the partnership's control over its business. (PIT. 561:14–17.)

The SEC questioned Mr. Howard regarding contractual limitations upon Merchant Capital's right to withdraw accounts from New Vision in an effort to demonstrate that a Merchant Capital RLLP did not have the ability to request that New Vision liquidate or return its fractionalized interest in a debt pool. (PIT.411:11–415:17.) In response to this questioning, Mr. Howard testified unequivocally that New Vision would permit a Merchant Capital RLLP to withdraw its fractionalized interest in a pool because it was his intent to "create a favorable servicing contract and environment with my client.... [I]f I don't do a good job, [Merchant Capital] will terminate the contract." (PIT.421:1–6.)

The SEC also asked Mr. Howard about potential limitations upon New Vision's ability to withdraw files from its collection agency, Enhanced Asset Management. (PIT.422:16–424:5.) Mr. Howard testified that because New Vision maintained the right to terminate its contract with Enhanced Asset Management, Enhanced Asset Management would cooperate with New Vision, for the same reasons that New Vision would cooperate with Merchant Capital. (PIT.424:1–5.) In fact, Enhanced Asset Management has previously

facilitated and permitted Merchant Capital RLLPs' request to liquidate their fractionalized interests in debt pools purchased through New Vision and assigned to Enhanced Asset Management for collection. (PIT.436:16–18.)

Most significantly, Steve Wyer testified at trial that RLLP 19 requested that its assets be returned to it in August 2004. (TT.420:1–11.). Merchant Capital was able to comply with this request and to in fact return all of the partnership's assets, including the partnership's individual debt files. (TT.420:12–13.) This testimony was not challenged by the SEC. The Court therefore finds that the RLLPs do in fact have the ability to control their individual debt file assets.

### C. *The Fractionalized Interests In A Large Debt Pool Can Be Converted Into Specific Accounts.*

The Court heard testimony concerning the process by which undivided interests in debt pools are identified and segregated for transfer or liquidation. This process is known as the "N–Select" process (PIT. 416:22–417:5), which is a random selection of accounts in a debt pool. It is a process similar to the one used by the credit issuer when it offers a "fresh debt" pool for purchase. (PIT.428:11–16.)

Kenneth Hall explained that when one uses the "N–Select" process in the context of segregating fractional interests in debt pools, there will almost invariably be one account that, if transferred, would give the transferee more than his fractionalized interest. At that point in the process, a dollar value is placed upon the portion of the account that exceeds the RLLP's ownership percentage. The RLLP then pays that amount to the other owners of the pool on a pro rata basis so that the liquidation is fully reconciled. (PIT.457:3–458:7.)

Mr. Howard testified that over the course of New Vision's relationship with Merchant Capital, there were not many requests made of New Vision to liquidate fractionalized interests in debt pools. (PIT.435:17–23.) Nevertheless, when such a request was made by Merchant Capital RLLPs, Mr. Howard confirmed that the "N–Select" process was successfully used by New Vision to permit Merchant Capital to liquidate a fractionalized interest in a debt pool. (PIT.436:12–15.)

Mr. Howard testified that New Vision had improved its ability to perform the "N–Select" process, which made it easier for New Vision to segregate fractionalized interests from larger debt pools than it had previously been for New Vision, at the time that Mr. Howard was deposed in September 2002 by the SEC. (PIT.427:25–428:4.)

As referenced above, Merchant Capital actually used the "N–Select" process in August 2004 to identify and return the specific individual debt files owned by RLLP 19. This process was completed satisfactorily and without any problems or complaints on behalf of the partnership. (TT.420:14–22.)

The Court finds that the general partners of the Merchant Capital RLLPs do in fact have the ability to control the assets of the RLLPs.

### X. *Alleged Material Misrepresentations or Omissions*

The SEC has alleged that Merchant and its principals have made material misrepresentations and omissions to prospective partners.

### A. *"Pooling"*

According to the SEC, the offering materials "make it appear that the individual partners pool their funds into one partnership and use their total capital contri-

bution to purchase, collect and resell pools of debt" when, instead, "the individual Merchant partnerships purchase fractional interests in large debt pools from New Vision" with large numbers of other investors. (Compl.¶¶ 46–47.) However, as discussed above, the RLLPs can function either way because there is nothing requiring Merchant Capital or the Merchant Capital RLLPs to purchase debt from New Vision or to continue to purchase only fractionalized interests in large debt pools rather than purchasing 100% of smaller debt pools of either fresh, secondary, tertiary or "quad" debt. Nor are they prohibited from purchasing 100% of "in house returns" files or from purchasing 100% of fresh debt through "one-off" sales or single sale contracts.

The SEC contends that Merchant Capital RLLPs could not operate profitably unless they pooled their resources with other entities, because they would not have enough capital in their own RLLPs to purchase "fresh debt" directly from banks.

While it is possible that when "fresh debt" is purchased directly from a bank the size of the purchase may have some impact on profitability, that is not always the case. (PIT.403:4–24.) Mr. Howard testified that he is aware of instances in which another debt purchaser has bought less debt than New Vision has, yet still obtained a better price for the debt than New Vision did. (PIT.406:4,5.)

Mr. Howard testified that if an RLLP wanted only to buy fresh debt directly from a bank, it might be at a disadvantage if it did not participate in a pooling process. However, if the RLLP was prepared to purchase debt on the secondary market, it could do that "very easily regardless of the amount of money [the RLLP is] willing to spend." (PIT.407:8–14.) Fred Howard testified that in the secondary debt market, in which debt is purchased after it has been placed with at

least one collection agency, debt can be purchased at virtually any face amount. (PIT.403:8–12.)

There is no prohibition upon the Merchant Capital RLLPs purchasing secondary, tertiary, or "quad" debt. (PIT. 549:24–550:1.) Merchant Capital never advised any of the RLLP partners that they would be purchasing only "fresh debt" from banks (PIT.548:24–549:8), and the partnership application suggests they would be purchasing other types of debt as well:

> The RLLP will pay up to forty percent (40%) for collection services to be performed on debt pools consisting of primary or "fresh" accounts and up to fifty percent (50%) for debt consisting of secondary, tertiary, or "quad" accounts.

(PIT.550:2–15; Pl.Ex.2, p. 3).

The SEC also attempted to establish that the Merchant Capital RLLPs could not operate profitably unless they purchased debt through third-parties who have forward-flow contracts with debt issuers. However, Fred Howard testified that the fact that debt is purchased through a forward flow contract does not always mean that the debt is cheaper than it would be if not purchased through a forward flow contract. (PIT.328:17–19.)

One of the SEC's own expert witnesses, Louise Epstein, testified that forward-flow contracts are oftentimes not the most profitable way to buy debt, and that one can be profitable in the debt-buying business without ever utilizing forward-flow contracts. (TT.223:14–224:8.)

The Merchant Capital partnerships have many sources of profitable debt they could purchase without pooling their capital. New Vision, for example, buys both small debt pools and large debt pools. (PIT. 398:3–23.) New Vision purchases debt files that range from less than $100,000 to as

large as $35,000,000. (PIT.339:16–340:16; PIT.398:7,8; PIT.399:1–7.) Approximately 40%–50% of New Vision's debt purchases consist of "in-house returns." (PIT. 400:22–401:4.) These files can be purchased in small face amounts without any impact upon profitability. (PIT.400:10–21.)

Mr. Howard also testified that banks have what is called a "one-off sale," in which the debt issuers sell remaining debt files after they have sold larger debt pools to their forward-flow contract purchasers. (PIT.410:4–13.) In one-off sales, the debt files sold directly by the bank may be offered for sale for as little as $25,000. (PIT.410:4–13; PIT.561:5–7.)

Merchant Capital RLLPs have purchased 100% of a debt pool for as little as $24,800. (PIT.561:5–7.) The price for that pool, $.05 per $1 face amount, was identical to the price Merchant Capital RLLPs paid for fractionalized interests in a larger pool for the same debt. (PIT.561:8–13.)

The SEC's expert witness, Ms. Epstein, confirmed that, based upon her own experience, there are times when debt can be purchased through one-off sales at prices that are more attractive than debt purchased through forward-flow contracts. (TT.224:17–225:1.)

Mr. Beasley and Mr. Wyer each testified that Merchant Capital did not disclose in the partnership application the fact that RLLPs might pool their funds with other entities to purchase debt pools because they did not believe that fact was material. (PIT.505:11–20; PIT. 598:17–599:6.) Fred Howard testified that he did not disagree with that view. (PIT.395:10–15.)

Because the partnerships would not necessarily be pooling their assets to purchase debt, there was no reason why Merchant Capital should have disclosed the pooling to prospective partners. Moreover, since pooling would not adversely affect the partners in any way, defendants never even considered whether it should be dis-closed in the offering documents. In that connection, Mr. Wyer testified that the fact that an RLLP owns a percentage interest in a debt pool as opposed to an entire debt pool does not adversely impact the partnership's control over its business. (PIT.:561:14–17.) Mr. Beasley confirmed that the RLLPs can control their debt, maintain their debt, and take control and possession of their debt, despite the fact that they own fractionalized interests in larger debt pools. (PIT.498:2–6.) This fact was demonstrated in August 2004 when RLLP 19 had its fractionalized interests returned to it. (TT.420:1–11.)

Nonetheless, Merchant Capital does expressly disclose to the RLLP partners through correspondence and through ballots that the debt pools being purchased "may be divided among several RLLPs." (PIT.505:21–25; PIT.506:17–507:11; Def. Ex.10.) In making this disclosure to all of the RLLP partners on a monthly basis, Merchant Capital intended to ensure that the partners understood that their RLLP could be participating in the purchase of a debt pool with other RLLPs. (PIT. 507:12–20.)

The Court finds that defendants had no duty to disclose the possibility of pooling in the offering documents and that the failure to do so was not a material omission.

### B. *The Identity of New Vision*

The SEC also contends that Merchant Capital was obligated to disclose the specific identity of New Vision to all of the RLLP partners. The role New Vision played for Merchant Capital was plainly disclosed in the partnership application:

> If elected, Merchant Capital, LLC, shall contract, retain, and oversee relationships with one or more outside vendors who will assist the Partnership in ana-

lyzing, purchasing, selling, and managing the debt assets of the RLLP. (Pl.Ex.2, p. 5; PIT.508:9–24.)

As already addressed above, Merchant Capital's relationship with New Vision was not exclusive and Merchant Capital always could have, and ultimately did, enter into relationships with other outside vendors who provided services similar, if not identical, to those provided by New Vision. (PIT.509:6–8.) Mr. Beasley testified that it was always Merchant Capital's intention to have a number of relationships with third-party vendors (PIT.509:9–21), and Merchant Capital therefore never even considered that it would be necessary to specifically identify New Vision by name. (PIT. 509:12–21; PIT.604:7–13.)

Mr. Beasley and Mr. Wyer each testified that Merchant Capital had no reason to conceal the identity of New Vision and never attempted to do so. (PIT.509:22–24; PIT. 599:7–10.) In fact, a number of the partners were familiar with New Vision and with the role it played for Merchant Capital. (PIT.510:14–22.)

The Court finds that defendants had no duty to identify New Vision in the offering documents and that their failure to do so was not a material omission.

## C. *Fee Disclosures*

The SEC called David Crumpton to testify as an expert witness at trial. Mr. Crumpton is a certified public accountant and certified fraud examiner. (TT.35:15–20.) He was engaged by the SEC for a threefold assignment: (1) to determine whether the information shown on the monthly partnership financial reports to the general partners was, in fact, supported by the transactions on the underlying source documents, such as bank statements, reports from portfolio managers, collection agencies and other types of documentation; (2) to determine whether the financial transactions of the partnerships were consistent with the disclosures that were contained in the partnership offering documents and in the various management and servicing agreements in which the partnerships entered; and (3) to evaluate the financial performance of the partnerships to determine whether they were meeting the internal Merchant Capital financial projections and to evaluate the potential overall financial returns to the general partners. (TT.36:6–20.) Mr. Crumpton's findings were memorialized in three reports that were admitted into evidence. (T.Exs. 134, 135, 328.)

Mr. Crumpton testified that, with the exception of a few minor discrepancies that he considered to be immaterial, Merchant Capital had been truthful and accurate in all of its financial reporting to the general partners. (TT.58:9–20.) Mr. Crumpton testified specifically that he saw no indication of "any malfeasance" by Merchant Capital. (TT.58:19–20.) He further testified that he uncovered no evidence of any fraud on the part of defendants during the course of his engagement. (TT. 59:7–13; 59:22–60:3.)

Mr. Crumpton testified that he and his staff accountant spent approximately 310 hours in the course of their engagement on behalf of the SEC. (TT.37:11–16.) Mr. Crumpton testified that he and his staff accountant spent approximately 250 hours of that time prior to September 17, 2003, when he prepared Trial Exhibit 134, which set forth his original findings regarding his evaluation and audit of Merchant's business records and financial reports. (TT.60:18–62:16.) At the time he completed Trial Exhibit 134 in September 2003, Mr. Crumpton had not found any potential irregularities or discrepancies in the manner in which Merchant calculated any fees or paid itself or any third-party any fees. (TT.63:12–24.)

It was not until shortly before the preparation of his Supplemental Expert Report on May 11, 2004, that Mr. Crumpton discovered the three alleged irregularities about which he offered testimony during trial. (TT.62:9–63:24.) Mr. Crumpton acknowledged that the fee calculation methodology with which he took issue was a "subtle" distinction that did not carry any indicia of "fraud or malfeasance" on the part of Merchant Capital. (TT.63:12–64:8.)

The SEC contends that the partnership application and agreement "misrepresent the fees that will be charged to the partnership on purchases of debt with proceeds from collections" in three separate categories.

### 1. Repurchase Fee Disclosures

The SEC contends that certain "repurchase fees" are misrepresented because the offering circular states that there will be a "fee of not more than five percent (5%) of the purchase price" when, in fact, the total fee, including the 4% compensation payable to the managing partner upon a repurchase, can be as high as 9%.

In the partnership application and agreement, Merchant Capital makes the following disclosure:

Initial purchase of debt by the RLLP will incur a fee of no more than six percent (6%) of the purchase price. Subsequent purchases of debt by the RLLP will incur a fee of no more than five percent (5%) of the purchase price.

(Pl.Ex.2, p. 3.) As explained by Kurt Beasley, the drafter of this provision, this section informs prospective partners that repurchases of debt by an RLLP will include the payment of a fee to a third-party vendor of no more than 5% of the repurchase price. (PIT.502:8–19.)

Section 7.4 of the partnership agreement further provides:

The Managing General Partner shall receive a management performance bonus of fifty percent (50%) of the net partnership proceeds or assets at the time the RLLP terminates and shall receive four percent (4%) from on-going collections and four percent (4%) of repurchases or reinvestment of debt on behalf of the RLLP.

(Pl.Ex.2, p. 29; PIT.501:15–503:12.)

The SEC claims that a prospective partner would not understand that the 5% repurchase fee payable to a third-party vendor disclosed in the partnership application at page 3 does not include the 4% compensation payable to the managing partner upon the repurchase of debt which is disclosed at page 29.

Mr. Beasley and Mr. Wyer each testified that there was no effort on Merchant Capital's part to conceal the fact that the five percent (5%) fee payable to a third-party and the four percent (4%) compensation payable to the managing general partner upon subsequent purchases of debt should be added together to reflect a total payment of nine percent (9%) of fees and compensation upon an RLLP's repurchase of debt. (PIT.503:24–504:11; PIT.598:8–16.) In fact, the monthly statements Merchant Capital sends to each of the RLLPs' partners clearly reflect as separate line items the five percent (5%) repurchase fee paid to a third-party vendor and the four percent (4%) fee paid to the managing general partner upon the repurchase of debt. (PIT.504:12–23; PIT.598:15,16; Pl. Ex.22(a); Pl.Ex.22(b).)

Mr. Beasley testified that until this action was brought by the SEC, no partner of any RLLP ever suggested that the two sections created an ambiguity or were otherwise misleading to the partners in any way. (PIT.504:4–11.) One of the partners even sent a letter to Merchant Capital complaining not about the two separate fees, but that New Vision was the recipient

of the 5% fee. (PIT.535:11–537:2; Pl.Ex. 115.)

The SEC further contends that Merchant Capital misrepresents its fees in this category by virtue of the manner in which Merchant Capital's percentage fee is calculated. Pursuant to the partnership agreement, Merchant Capital, as managing general partner, is entitled to receive four percent (4%) of repurchases or reinvestment of debt. (TT.54:19–21.) According to the testimony of the SEC's expert witness, Mr. Crumpton, Merchant's four percent (4%) fee was calculated from the *gross* amount of funds to be remitted for the repurchase of debt, instead of the *net* amount of the funds actually used for the repurchase of debt. For example, if $100 were to be used for the repurchase of debt, then New Vision was paid its five percent (5%) fee of $5 first, then Merchant was paid its four percent (4%) fee of $4 second, leaving only $91 of funds actually available for the repurchase of debt. (TT.54:19–55:2.)

According to Mr. Crumpton, this methodology caused the actual total repurchase fee percentage to be 9.98%, instead of the 9% that was disclosed in the partnership agreement to the general partners. Mr. Crumpton further testified that this methodology resulted in the overcharging of approximately $57,200 in fees. (TT.55:6–13.)

The Court finds that the use of this methodology by Merchant Capital does not reflect any malfeasance or intent to deceive by Merchant Capital. The Court finds that the total debt repurchase fees charged to the partnerships did not exceed 9% of the *gross* amount of funds available for the repurchase of debt. While the methodology used by Merchant Capital ultimately yielded total fees in the amount of 9.98% of the *net* funds available for the repurchase of debt, this discrepancy does not rise to the level of a material misrepresentation on Merchant Capital's behalf.

### 2. Initial Debt Acquisition Fee

The SEC, through its expert Mr. Crumpton, alleged a similar complaint regarding the initial debt acquisition fee charged by New Vision. Pursuant to the partnership agreement, New Vision was entitled to receive a fee of six (6%) percent of the funds provided by the partnerships for the initial purchase of debt. (TT.53:16–20.) Because Merchant Capital used the same methodology as referenced above (calculating the fee from the *gross* funds presented for debt acquisition, instead of from the *net* funds available after the fees were charged), the actual fee percentage was 6.38% of the total funds used for purchase, instead of 6%. According to Mr. Crumpton, this resulted in overpayment of fees to New Vision in the approximate amount of $60,500. (TT.54:2–10.)

The Court again finds that the use of this methodology by Merchant Capital does not reflect any malfeasance or intent to deceive by Merchant Capital. The Court finds that the New Vision fees did not exceed 6% of the *gross* amount of funds to be used for the initial purchase of debt. While it is true that the methodology used by Merchant ultimately yielded New Vision fees in the amount of 6.38% of the *net* funds available for the initial purchase of debt, this discrepancy does not rise to the level of a material misrepresentation on Merchant Capital's behalf.

### 3. Merchant Capital's Collections Fee

The third and final alleged material misrepresentation regarding fees charged by Merchant Capital are the collections fees. Pursuant to the partnership agreement, Merchant Capital, as managing general partner, was entitled to receive four (4%)

percent of "ongoing collections." (TT.55:19–21.) The SEC's expert, Mr. Crumpton, conceded that the term "collections" is not clearly defined in the partnership agreement. (TT.55:21–22.)

Mr. Crumpton testified that Merchant Capital again calculated its four (4%) percent fee from the *gross* amount of collections, and not from the *net* amount of collections once the collection agency had been paid its own fee. (TT.55:23–56:4.) According to Mr. Crumpton, this methodology resulted in overcharges to all of the partnerships collectively in the approximate amount of $336,000. (TT.56:5–8.)

The Court finds that the partnership agreement, while potentially ambiguous with respect to this provision, does not mandate that Merchant Capital calculate its fees from the *net* collections, as opposed to the *gross* collections. To the extent that the provision could be so interpreted, Merchant Capital's failure to do so does not rise to the level of a material misrepresentation.

Mr. Crumpton testified that he did not provide his calculation of the $330,000 collections fee overcharge to defendants in any of his expert reports prior to offering his testimony at trial. (TT.65:10–20.) In fact, Mr. Crumpton conceded that he had not provided any damage calculation whatsoever attributable to collections fee overcharges anywhere in his expert reports. (TT.65:18–20.) To the contrary, based upon his exhaustive and thorough review of Merchant Capital's financial records, the total amount of potential "overcharges" he had identified prior to trial equaled approximately $117,700. (TT. 66:20–67:4; 65:1–2.) This sum represented the only fees that the SEC's expert had identified prior to trial as being potentially excessive, out of approximately $5.2 Million in total fees that had been charged over the life of the partnerships through June 30, 2004. (TT:67:13–68:6.)

Mr. Crumpton further testified that to the extent the $117,700 potential "overcharges" were inconsistent with any of the representations made to the general partners, he had no reason to believe that the inconsistency was anything other than an inadvertent mistake on the part of Merchant Capital. (TT.63:25–64:8.)

Furthermore, Mr. Crumpton testified that when Merchant Capital made the decision to change third-party vendors from New Vision to Trilogy Capital Management, it reduced the amount of the sales fee from 14% to 7%. (TT.83:7–10.) As a consequence of that fee reduction alone, Merchant Capital saved the general partners more than the $117,700 that was even arguably overcharged. (TT.83:11–84:2.)

The Court finds that neither Merchant Capital, Wyer nor Beasley made any misrepresentations or omissions of material facts to prospective RLLP partners.

## XI. *The Business Model*

Merchant Capital had a business model that was provided by Fred Howard of New Vision in the summer of 2001. (PIT.108:5–12; PIT.324:13–23; PIT.567:16–24). Mr. Wyer testified that Mr. Howard told Merchant Capital that New Vision's RLLPs were performing consistent with the model's projections at the time the model was given to Merchant Capital. (PIT.567:25–568:3.)

The "breakeven" business model, using assumptions based on the historical experience of New Vision's RLLPs, was designed to yield profits sufficient to make regular quarterly distributions equal to 3.6% of each partner's initial capital contribution and then to return the partner's entire capital contribution when the RLLP liquidates. Any remaining assets are then to be split evenly between the partners and the managing general partner. (PIT. 474:6–18.)

The SEC called David T. McClellan during the preliminary injunction hearing to testify regarding the model. Mr. McClellan is an accountant employed by the SEC. (PIT.347:17–25.) During his direct examination, Mr. McClellan testified that he had performed an analysis of three of the twenty-eight Merchant Capital RLLPs. (RLLPs 801–1, 801–2 and 801–3). During his cross-examination, however, Mr. McClellan admitted that he had in fact performed an analysis of four Merchant Capital partnerships. He provided a copy of his analysis of the fourth partnership (801–4) to the SEC, but did not offer any testimony regarding his analysis of that partnership. (PIT.359:21–360:18.) Mr. McClellan was told by the SEC which of the partnerships to analyze. (PIT.363:22–25.)

Mr. McClellan testified that he used the New Vision model and substituted the actual historical collections performance of three of the Merchant RLLPs for the collections assumptions contained in the model. (PIT.350:4–22.)

With respect to his analysis of partnership 801–1, Mr. McClellan projected, pursuant to the New Vision model and the RLLP's actual collections to date, that the partnership would recover 89% of its total capital contributions by the conclusion of the thirty-six month partnership term. (PIT.362:2–8; Pl.Ex.24.)

With respect to his analysis of partnership 801–2, Mr. McClellan projected, pursuant to the New Vision model and the RLLP's actual collections to date, that the partnership would recover 80% of its total capital contributions. (PIT.362:18–363:6; Pl.Ex.25.)

With respect to his analysis of partnership 801–3, Mr. McClellan projected, pursuant to the New Vision model and the RLLP's actual collections to date, that the partnership would recover approximately 77% of its total capital contributions. (PIT:363:7–21; Pl.Ex.26.)

At the preliminary injunction hearing, defendants offered the testimony of Kenneth R. Hall, a CEO of a computer software company in Nashville, Tennessee, at the time. Mr. Hall has an undergraduate degree in computer science and an M.B.A. He has approximately twenty-five years of experience in the technology area of financial services. (PIT.444:1–12.) Mr. Hall also taught computer science as an adjunct professor. (PIT.444:20–24.)

Mr. Hall performed an analysis of the underlying fundamentals of the New Vision model (Pl.Ex.23), and determined that the New Vision model was mathematically sound. (PIT.445:25–446:2.) Mr. Hall also performed an analysis of the actual performance of all twenty-eight of the Merchant Capital RLLPs as compared with the model. (PIT:445:3–10.)

In the course of his analysis, Mr. Hall reviewed business records of Merchant Capital which reflected the gross collections per month for each of the twenty-eight RLLPs from the first month of the first RLLP through November 2002. (PIT.446:10–20.)

Mr. Hall identified reports that he generated reflecting the results of his analysis. Defendant's Exhibit 3 reflects the model's anticipated total collections from the inception of each RLLP through the end of November 2002, and compares those targets to the actual total collections during the same time period. (PIT.447:6–10; Def.Ex.3.)

Defendant's Exhibit 4 is a summary graph which reflects that the twenty-eight Merchant Capital RLLPs have a total capital contribution of $26,353,469. (PIT. 449:23–450:3; Def.Ex.4.) The total collections for all twenty eight Merchant Capital RLLPs through November 2002 equaled

$13,068,902. (PIT.450:10–12; Def.Ex.4.) The average age of a Merchant Capital RLLP as of November 30, 2002, was 6.18 months. (PIT.450:20–24; Def.Ex.4.)

Of the twenty-eight Merchant Capital RLLPs, only two were performing at a rate which was less than 60% of the model target. There were six RLLPs that were performing within a range between 61% and 75% of the model target. There were seven RLLPs performing within a range of 76% to 90% of the model target. Significantly, there were thirteen RLLPs performing at 91% or better of the model target, including some which were performing at a rate of more than 100% of the model target. (PIT.451:5–13; Def.Ex.3.)

Defendant's Exhibit 5 is a graph prepared by Mr. Hall reflecting that the total gross collections of the twenty-eight Merchant Capital RLLPs through November 2002 was $13,068,902. The total gross collections in the model for that same period was $15,909,847. Accordingly, the Merchant Capital RLLPs performed at an average of 82.14% of the model target through November 2002. (PIT.451:19–452:4; Def.Ex.5.)

Mr. Hall also testified that there are other factors within the control of the RLLPs which could further improve the performance of the RLLPs. These factors include the reduction of fees charged by the managing general partner and/or the third-party vendors (PIT.459: 10–18; PIT. 485:9–23), the decision of the RLLP to extend its term (PIT.484:5–15), and the decision of the RLLP to defer quarterly distributions (PIT.485:1–8).

This view was confirmed by Mr. Wyer, who testified that if the general partners agreed to reduce their quarterly returns or their deferred annual returns, it could have a significant impact upon the performance of the RLLPs prospectively. (PIT.568:22–572:10.)

Mr. Hall testified that if an RLLP collected approximately 83% of its model target, then in that event the general partners would receive all of their capital contribution back, if not the anticipated quarterly distributions. (PIT.483:19–484:4; PIT.488:17–489:1.)

The SEC's expert witness, Mr. Crumpton, testified at trial that, based upon his review, it was apparent that Merchant Capital continuously undertook to make modifications to the New Vision model, in an attempt to make the model a more accurate predictor of actual performance. (TT.90:10–18.)

Mr. Crumpton also conducted his own extensive analysis, review and projection of the actual performance of the Merchant Capital RLLPs and compared that actual performance with the performance that had been projected internally by Merchant Capital using the New Vision model. Mr. Crumpton concluded that upon the anticipated dissolution of the RLLPs, the average rate of return for the general partners will be 68.1% of the general partners' original capital contributions. (TT:45:10–21.)

The SEC has contended from the outset of this action that the fact that the RLLPs have not been profitable is a substantial factor to be considered by the Court. Indeed, a significant portion of the testimony and evidence offered by the SEC has attempted to establish this fact. The SEC has cited no legal authority, however, for the proposition that the profitability, or lack thereof, of a partnership is a factor to be considered in the determination of whether an interest in that partnership constitutes a security under federal law. The evidence was uncontroverted that Merchant Capital fully advised all of its prospective general partners of the speculative nature of the RLLP business and the significant risks attendant to one's participation in it. (PIT. 566:12–18; 566:21–

23; 566:24–567:5; Pl.Ex.2, p. 10; TT. 74:5–16; 222:14–17.)

Furthermore, the New Vision financial performance model was never provided to the general partners. (TT.70:16–20.) To the contrary, it was simply used by defendants for their own internal tracking purposes. (TT.70:21–71:1.) Had defendants provided the New Vision model to the general partners, it is certainly likely that the SEC would have contended that defendants made material misrepresentations to the general partners by giving them false assurances regarding the potential performance of the RLLPs. Plaintiff's expert, Mr. Crumpton, acknowledged this possibility. (TT.71:2–10.) Plaintiff's other expert witness, Ms. Epstein, testified that the New Vision model would not be a good predictor of the performance of the Merchant Capital RLLPs' performance. (TT.200:19–201:2.) This opinion further validated Merchant Capital's decision not to provide its internal tracking model to the general partners.

The Court finds that the Merchant Capital RLLPs are structured, operated, and managed as viable businesses. Although the RLLPs have not performed to date as well as projected by the New Vision model, Merchant Capital plainly disclosed the risks inherent in the business of the RLLPs. No guarantees were made to prospective general partners regarding the probability of success of the RLLPs. The SEC did not introduce any testimony or evidence that proved otherwise. To the contrary, both of the SEC's expert witnesses, Mr. Crumpton and Ms. Epstein, acknowledged that the general partners were clearly advised of the potential risks associated with the RLLPs prior to the time that they made their initial capital contributions. (TT:74:5–78:25; 222:14–17.)

The fact that it appears, according to the testimony of the SEC's own expert witness, Mr. Crumpton, that the general partners will receive, on average, approximately 68.1% of their original capital contributions back from a business venture that was plainly disclosed as being speculative and risky, is, if anything, a fact that tends to support defendants' conduct as the managing general partner of the RLLPs.

Even Lawrence J. Warfield, the Receiver for One Vision Children's Foundation, who was the only witness to testify unfavorably regarding his business experience with defendants, did not dispute the fact that, given the fully disclosed significant risks involved with the RLLPs, the anticipated return is within an acceptable range:

Q: If in the absence of any remedial action by Judge Shoob or any remedial action by the Court in Arizona One Vision received roughly 70% of its capital contribution [back] through the normal, ordinary process of the [liquidation] procedure, through a business venture that was plainly disclosed from the outset as being one that contained significant risks that ought not to be entered into unless the principal was prepared to lose his or her entire capital contribution, based upon your experience as an accountant, as a receiver, as a trustee, in your view, would that be a bad result?

A: I can't answer that.

(TT.401:23–402:8.)

In the Court's view, the fact that the SEC was unable to present the testimony of a single RLLP general partner other than Mr. Warfield who was dissatisfied with the performance of the Merchant Capital RLLPs is further evidence that defendants' conduct regarding the RLLPs was at all times appropriate, legal, ethical and forthright. While it is true that the general partners will not enjoy a profit from their partnership interests, they will receive, on average, 68.1% of their original capital contributions back, from a business

venture that was plainly and clearly disclosed as one which was speculative and risky.

## XII. Defendants' Cooperation with the SEC

It is undisputed that defendants have exhibited a high level of cooperation with the SEC since the inception of the SEC's investigation in this matter.

Prior to the filing of this action, Merchant Capital had no expectation that it would be filed. (PIT.511:10–13.) Merchant Capital was not given an opportunity by the SEC to make a Wells submission.[7] (PIT.511:14–22.) Nor was Merchant Capital given an opportunity to formally respond to any of the Commission's charges before this action was filed. (PIT.511:23–25.) The Friday before this action was filed, counsel for the SEC requested and received from Mr. Beasley a copy of the legal opinion letter issued by Baker, Donelson. (PIT.512:2–20.)

Merchant Capital cooperated fully with the SEC from the first phone call received by Merchant Capital in August of 2002. (PIT.512:21–513:9.) On his own initiative, Mr. Beasley drove from Nashville to Atlanta to meet with counsel for the SEC the day after he received the SEC's initial call. (PIT.513:2–9.) Merchant Capital produced voluminous documentation and each of the principals agreed to be repeatedly interviewed and deposed, despite the fact that no subpoenas were ever issued prior to the filing of this action. (PIT.513:10–25.)

Merchant Capital produced all of its bank records to the SEC. (PIT.499:20–22.) It withheld no information of any kind or form from the SEC. (PIT.514:17, 18.)

## CONCLUSIONS OF LAW

### I. The RLLP Partnership Interests Are Not Securities.

Defendants have denied that the Merchant Capital RLLP partnership interests are securities. They have accordingly asserted that the Court lacks subject-matter jurisdiction over this action. (PIT.24:17–20; Defendants' Answer, pp. 2 and 16.)

 "The Supreme Court has held that when the contested basis for jurisdiction is also an element of the plaintiff's federal claim, the claim should not be dismissed for lack of subject-matter jurisdiction." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 239 (4th Cir.1988)(citing *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). "When the claim is neither immaterial nor insubstantial, the proper course of action is for the district court to accept jurisdiction and address the objection as an attack on the merits." *Id.* Whether the Merchant Capital RLLPs are "securities" is both a question of subject-matter jurisdiction and an element of plaintiff's asserted claims under the federal securities laws. *Id.; AVC Nederland B.V. v. Atrium Investment Partnership,* 740 F.2d 148, 152–53 (2d Cir.1984); *Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).

Because each of plaintiff's claims requires a threshold determination that the Merchant Capital RLLP partnership interests are securities under the federal securities laws, the Court must accept jurisdiction and rule upon this pivotal issue at the outset of its analysis. The Court has considered plaintiff's claims upon the merits and has determined that the Merchant

---

7. A Wells submission is a document filed with the SEC in which a defendant presents the evidence and legal theories he believes the

SEC should consider in deciding whether to file an enforcement action. *See* 17 C.F.R. § 202.5(c).

Capital RLLP partnership interests are not securities under the federal securities laws. Accordingly, final judgment must be entered in favor of defendants as to all counts of plaintiff's complaint. The Court's conclusions in this respect are set forth below.

### A. The RLLP Partnership Interests Are Not Investment Contracts.

The SEC has alleged that the partnership interests in the RLLPs are "investment contracts" because they are passive investments. An investment contract is "a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and is led to expect profits [3] solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The parties do not dispute that the Merchant Capital RLLP partners invested money in a common enterprise, so the SEC's main focus is on the third requirement under the *Howey* test, *i.e.*, whether the partners "expect profits solely from the efforts of the promoter or a third party."

When the third requirement of the *Howey test* is applied to a general partnership, as is the case here, there is a strong presumption that the general partnership is not a security, and the SEC bears a heavy burden to prove otherwise.[8] *See Youmans v. Simon*, 791 F.2d 341 (5th Cir.1986); *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir.1981).

In order for the SEC to establish that the partnership interests in the Evergreen High Yield RLLPs are investment con-

tracts, it must prove that either (1) an agreement among the parties leaves so little power in the hands of the partner that the arrangement in fact distributes power as would a limited partnership; or (2) the partner is so inexperienced and unknowledgeable in business affairs that he or she is incapable of intelligently exercising his or her partnership powers; or (3) the partner is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he or she cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers. *See Williamson*, 645 F.2d at 424.

### 1. The Partners Have The Power To Control The Partnerships.

Under the first alternative, the Court examines the legal powers afforded to the partners by the terms of the partnership agreement without regard to whether and how they exercise such powers. *See Williamson v. Tucker*, 645 F.2d at 423–24; *see also Gordon v. Terry*, 684 F.2d 736, 741–42 (11th Cir.1982); *Perry v. Gammon*, 583 F.Supp. 1230, 1233 (N.D.Ga.1984).

Despite the SEC's allegations, the legal powers granted to the partners in the Evergreen High Yield RLLPs are not akin to a limited partnership, as evidenced by the partnership agreements and the powers granted to the partners under Colorado law. Unlike the RLLP partners, limited partners cannot ordinarily dissolve the partnership, bind other partners, or take an active role in the management of the partnership. *See Youmans*, 791 F.2d at 346. Here, the partners are required to

8. At the preliminary injunction hearing, the SEC presented the Court with a Colorado Court of Appeals decision which held that the presumption that a general partnership interest is not a security does not apply to an LLP interest in Colorado. *Toothman v. Freeborn & Peters*, 80 P.3d 804, 811–13 (Colo.App.2002).

However, even if the Court accepted the reasoning in *Toothman*, it would not change the Court's conclusion. Even absent the presumption, the Court would still conclude that the Evergreen High Yield RLLP partnership interests are not securities.

take an active role in managing the partnership business and expressly agree to do so in the partnership agreement.

Although the partnerships have contracted with Merchant Capital to have some of the management functions performed by Merchant Capital and by persons with whom Merchant Capital contracts, the partnership agreement is clear that Merchant Capital does not have the authority to manage the partnership. The partnership agreement also makes it clear that only the partners have authority to manage the business, and with respect to the primary partnership decision, the purchase and sale of debt, Merchant Capital is expressly prohibited from acting without the approval of two-thirds of the partners in each partnership.

The partners control the business by controlling the purse strings—a two-thirds vote of the partnership units is required for the managing general partner to enter into any obligation involving a total obligation of more than $5,000 or to incur any expenses in excess of $5,000 per month (Pl.Ex.2, Section 7.6.) The partners are invited to participate in quarterly conference calls (Pl.Ex.2, Section 7.9) and on one or more committees (Pl.Ex.2, Section 7.2). The partners elect a managing general partner and can remove the managing general partner by a two-thirds vote of the units if the managing general partner materially fails to carry out its duties. (Pl. Ex.2, Section 7.8.). The partners can elect to seek additional funding after the initial closing of the partnership (Pl.Ex.2, Section 4.3) and have the ability to dissolve the general partnership prior to the original stated term (Pl.Ex.2, Section 9.1; *see also* Colo.Rev.Stat. § 7–60–431)or to extend the partnership beyond its stated 36–month term.

In addition, the Merchant Capital RLLP partners can bind the other partners (Colo. Rev.Stat. § 7–60–109), an admission or representation made by a partner concerning partnership affairs is evidence against the partnership (Colo.Rev.Stat. § 7–60–111), notice to any of the partners of any matter relating to partnership affairs operates as a notice to the partnership (Colo. Rev.Stat. § 7–60–112), and a wrongful act or omission of any partner acting in the ordinary course of the business of the partnership renders the partnership liable (Colo.Rev.Stat. § 7–60–113).

The fact that the partners are granted these powers by the terms of the partnership agreement and Colorado law is the critical factor in this analysis. The fact that an individual partner may choose to remain passive does not convert his or her RLLP partnership interest into an investment contract. *See Mr. Steak, Inc. v. River City Steak, Inc.* 460 F.2d 666, 670 (10th Cir.1972) ("That River City Steak delegated performance of ... duties and ignored daily operations does not affect the nature of its powers, nor change the essential fact that River City Steak abandoned what rights of control and participation it did have").

In *Rivanna Trawlers Unlimited,* 840 F.2d at 240–41, the court confirmed that the "mere choice by a partner to remain passive is not sufficient to create a security interest." The court went on to note that:

> When ... a partnership agreement allocates powers to the general partners that are specific and unambiguous, and when those powers are sufficient to allow the general partners to exercise ultimate control, as a majority, over the partnership and its business, then the presumption that the general partnership is not a security can only be rebutted by evidence that it is not possible for the partners to exercise those powers.... [E]ven when general partners do not individually have decisive control over major decisions, they do have the

sort of influence which generally provides them with access to important information and protection against dependence on others.

*Id.* at 241.

Out of the many characteristics listed above that are not present in a limited partnership, the SEC focuses on just two of them to argue that the Merchant Capital RLLPs "distribute power as would a limited partnership." First, the SEC argues that, although the partners can vote to dissolve the partnership at any time, "the general partnership's manner of doing business effectively prevents such an action," because the partners "would be unable to liquidate the partnership's investments, because they cannot sell their fractional interest in a debt pool, except as permitted by New Vision." In fact, however, Merchant Capital demonstrated through the testimony of four witnesses that the Merchant Capital RLLPs can sell their fractional interests in the various debt pools that they own at any given time. In fact, Merchant Capital established at trial that one of the RLLPs (RLLP 19) did in fact liquidate its fractional interests in the various debt pools successfully. (TT.420:1–11.)

Second, the SEC points to the fact that partners' power to remove the managing general partner is limited and argues that this somehow eliminates the partners' control over the business. Restrictions on the right to change management are not determinative to a finding that an investment contract exists, if the partners retain ultimate control. *See Schultz v. Dain Corp.,* 568 F.2d 612 (8th Cir.1978) (finding that appellant maintained ultimate control over an apartment complex despite his inability to unilaterally cancel a three year management contract during its term). Here, as set forth above, the partners maintain ultimate control because only they have the authority to manage the business. Fur-

thermore, Merchant Capital established at trial that one of the RLLPs (RLLP 19) did in fact replace Merchant Capital as its managing general partner. (TT.420:1–11.)

The Court concludes that the RLLP partners have the ability to manage and control the business of the RLLP.

### 2. *The General Partners Are Not So Dependent On The Unique Entrepreneurial Or Managerial Ability Of Merchant Capital Or New Vision So As To Make Them Irreplaceable.*

The SEC contends that the Merchant Capital RLLP partners are relying on the unique entrepreneurial or managerial ability of Merchant Capital and New Vision. The fact that the partnerships contract with Merchant Capital to perform management services is not enough to convert the partnership interests into investment contracts; rather, the SEC must establish that the partners are so dependent on the unique entrepreneurial or managerial ability of Merchant Capital that they cannot replace Merchant Capital or otherwise exercise meaningful partnership powers. *See Williamson,* 645 F.2d at 424 ("We must emphasize, however, that a reliance on others does not exist merely because the partners have chosen to hire another party to manage their investment. The delegation of rights and duties—standing alone—does not give rise to the sort of dependence on others which underlies the third prong of the *Howey* test").

In *Williamson,* the plaintiffs acknowledged that they purchased their joint venture interests on the expectation that they would rely on the manager to make all management decisions. *Id.* In finding that no security existed, the court stated that the "plaintiffs have at no point asserted or alleged that [the manager] was uniquely capable of either managing or developing

the property, or that their dependence on [the manager] was so great that they were incapable, within reasonable limits, of finding a replacement." *Id.* at 425.

In *Rivanna Trawlers,* the court noted that the issue is not whether the partners could replace their managing general partner with *themselves,* but rather whether they are capable of finding *another* replacement manager. 840 F.2d at 241 n. 5.

As discussed above, there are 6,500 agencies in the United States that collect debt. (PIT.119:3–4.) Neither Wyer nor Beasley had any previous debt collection experience prior to forming Merchant Capital. (PIT.36:3–5). According to Fred Howard, there are many other people in the industry who could replace Merchant Capital as the managing general partner of the RLLPs. (PIT.395:16–23.) Wyer confirmed this testimony, and testified regarding a trade association, The Debt Buyers' Association, which has hundreds of members in the industry, many of whom would be capable of serving as the managing general partner of an RLLP. (PIT.547:7–548:19; Def.Ex. 11.)

Wyer testified that despite having no previous experience in the industry he became knowledgeable enough to function as a managing general partner of an RLLP within thirty days through self-education, (PIT.546:17–23.) Wyer testified further that the partnerships could operate profitably without Merchant Capital's involvement if the partners would take the necessary time and effort to educate themselves regarding the role and function of the managing general partner. (PIT.548:20–23.) Louise Epstein, one of the SEC's expert witnesses, testified that one can be successful in the debt-buying business with very little capital and absolutely no previous experience. (TT.232:1–10.) Clearly, Merchant Capital, as the managing general partner, is replaceable. As demonstrated during the trial of this case, Merchant

Capital was in fact replaced as the managing general partner by RLLP 19 in August 2004. (TT.420:1–11.)

The SEC also contends that New Vision provides "unique entrepreneurial or managerial ability" that the partners are unlikely to be able to replace. The SEC's contention is completely undermined by the fact that Merchant Capital did, in fact, replace New Vision with respect to its debt purchases. In addition, Merchant Capital had discussions with other companies to perform similar services to those being provided by New Vision both prior to and subsequent to this action being brought by the SEC. (PIT.550:23–551:4; PIT.564:22–565:2.) In September of 2002, Merchant elected to replace New Vision with Trilogy Capital Management. (TT.249:18–23.) The contract between Merchant Capital and Trilogy was entered into on January 2, 2003. (TT.251:10–19.) In November 2003, Merchant Capital balloted the general partners to seek their permission (which was granted) to replace Trilogy with Merchant Management, an affiliated entity, to perform the third-party vendor services. (TT. 249:18–250:2; TT.251:2–6.)

Accordingly, the SEC has not shown that New Vision (or any other third-party vendor) is unique or irreplaceable. The Court concludes that the RLLP partners are not so dependent upon the unique entrepreneurial or managerial skills of either Merchant Capital or New Vision that they cannot replace them or otherwise exercise meaningful partnership powers without them. In point of fact, they have both been replaced.

3. *The Partners Are Not So Inexperienced Or Unknowledgeable In Business Affairs That They Are Incapable Of Intelligently Exercising Their Partnership Powers.*

In *Rivanna Trawlers Unlimited,* 840 F.2d at 241 n. 7, the Fourth Circuit deter-

mined that requiring a court to look at the actual knowledge and business expertise of each partner in order to assess his or her individual ability to intelligently exercise the powers of a general partnership would undercut the strong presumption that an interest in a general partnership is not a security and would unduly broaden the scope of the Supreme Court's instruction that courts must examine the economic reality of partnership interests.

The Court concludes that *Williamson* does not require the Court to look to the actual knowledge and business expertise of each partner in order to assess his or her individual ability to intelligently exercise the power of a general partner. *See Rivanna Trawlers*, 840 F.2d at 241.

The Court further concludes that the SEC has not established that the partners, as a group, are incapable of intelligently exercising their partnership powers. Indeed, the demographics suggest the exact opposite. Steven Wyer testified that Merchant Capital instructed its recruiters to look for potential general partners who had a minimum net worth of $250,000 with good general business knowledge and experience, and who were willing to actively participate in the management of the business of the RLLP. (PIT.579: 14–19.)

Each partner has a net worth of at least $250,000 and more than 75% of the partners reported net worth in excess of $500,000. (PIT. 579:20,21; PIT. 596:2–25.) A significant number of the partners have a net worth in excess of $1,000,000. (PIT. 596:11–23.) Ninety percent (90%) of the partners have a degree of business experience ranging from "average" to "excellent." (PIT.597:1–4.)

Although many of the partners may not have prior experience purchasing charged-off consumer debt, the persons described by the statistics above are not inexperienced and unknowledgeable in business affairs. To the extent that partners did not

have expertise specific to the debt pool industry, they may choose to educate themselves or contact the other partners in their particular partnership (or other third persons) to assist them in making any partnership decisions.

Finally, the partners have access to and are provided with all the information necessary to make partnership decisions. In particular, the partners have all the information necessary to perform the same analysis that Merchant Capital performs in evaluating the potential purchase or sale of debt. (PIT.586:10–12.) The monthly statements the partners receive and the ballots provide them with the name and category of every pool of debt in which they own an interest, the date the interest was purchased, the length of time the RLLP has held the interest, and both the historical gross and net collections from the debt. (PIT.586:10–24.) Each RLLP has quarterly meetings to which each partner is invited and where the partners are provided additional information regarding their monthly statements and any questions they have are answered. (PIT.81:16–82:1.) The partners also have complete access to the RLLP's books and records, in accordance with the express terms of the RLLP's partnership agreement. (PIT. 586:25–587:2; Pl.Ex.2, p. 9.)

The Court concludes that the RLLP partners are not so inexperienced or unknowledgeable in business affairs that they are incapable of exercising their partnership powers.

## B. *The RLLP Partnership Interests Are Not Certificates Of Interest Or Participation In A Profit–Sharing Arrangement.*

██ The SEC further alleges that the partnership interests are securities under the theory that they are "certificates of interest or participation in a profit-sharing

arrangement" because the partners receive a physical certificate showing their participation in the profits of their particular partnership. However, as acknowledged by the SEC, "the touchstone of any analysis of whether a particular instrument is a security under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act is the substance rather than the form of the transaction with an emphasis on economic reality."

Because the partnership interests are not securities under the investment contract theory espoused by the SEC, the SEC's theory that they become a security because a physical certificate is issued to the partners elevates form over substance. *See Goodwin v. Elkins & Co.*, 730 F.2d 99, 102 n. 4 (3rd Cir.1984) (finding that whether an interest is characterized as an "investment contract" or as a "profit sharing arrangement," it still must meet the requirements of *Howey); see also Marine Bank v. Weaver*, 455 U.S. 551, 560, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982) (finding that a profit sharing provision alone is not enough to make an agreement a security). Under the SEC's theory, a law or accounting firm's partnership interests would become securities if the firm issued certificates to its partners representing their "points" or other form of participation in firm profits.

The Court concludes that the RLLP partnership interests are not certificates of interest or participation in a profit-sharing arrangement.

### C. Since the RLLP Partnership Interests Are Not Securities, the SEC Is Not Entitled to Injunctive Relief, and Defendants Are Entitled to Final Judgment in Their Favor.

Having determined that the RLLP partnership interests are not securities, the SEC's application for injunctive relief must be denied. Furthermore, because the Court's subject-matter jurisdiction of this action must be premised upon a finding that the RLLP partnership interests are securities, judgment must be entered in favor of defendants as to all counts of plaintiff's complaint. *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *see also Futura Development Corp. v. Centex Corp.*, 761 F.2d 33, 38 (1st Cir.), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 121 (1985); *AVC Nederland B.V. v. Atrium Investment Partnership*, 740 F.2d 148, 152–53 (2d Cir.1984); *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).

### II. Even If the RLLP Partnership Interests Were Securities, Injunctive Relief Would Still Be Inappropriate.

■ As discussed above, the Court has determined that the Merchant Capital RLLP partnership interests are not securities. However, even if the Court had reached the opposite conclusion, and determined that the RLLP partnership interests do constitute securities, the Court would still have concluded that injunctive relief was inappropriate.

With respect to the SEC's claims pursuant to Sections 5(a) and 5(c) of the Securities Act and Section 15(a) of the Exchange Act, even if the Court had determined that the RLLP partnership interests were securities, the SEC failed to demonstrate that there is a likelihood of any future violations by defendants. With respect to the SEC's claims pursuant to Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, the SEC failed to present a *prima facie* case that there have been any past violations by defendants and also failed to demonstrate the likelihood of any future violations.

Under Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), the Court may enter an injunction only when the SEC establishes the following: (1) a *prima facie* case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated. *SEC v. Unique Fin. Concepts, Inc.,* 196 F.3d 1195, 1199 n. 2 (11th Cir.1999).

■ As noted by the Fifth Circuit, "To obtain injunctive relief the Commission must offer positive proof of the likelihood that the wrongdoing will recur. . . . The Commission needs to go beyond the mere fact of past violations." *SEC v. Blatt,* 583 F.2d 1325 (5th Cir.1978). Indeed, the SEC must show a "propensity" of the individual against whom the preliminary injunction is sought to violate the law. *SEC v. Bangor Punta Corp.,* 331 F.Supp. 1154, 1163 (S.D.N.Y.1971) (denying injunction and finding that "the Commission has failed to carry its burden to establish, with persuasive evidence, that [defendants] have a propensity or natural inclination to violate the securities law").

Even if the Court had determined that the Merchant Capital RLLPs' partnership interests were securities, the SEC has failed to offer "positive proof" that defendants have the "propensity" to violate the federal securities laws. *See SEC v. Blatt,* 583 F.2d 1325 (5th Cir.1978); *SEC v. Bangor Punta Corp.,* 331 F.Supp. 1154, 1163 (S.D.N.Y.1971).

### A. The SEC Failed to Prove a Likelihood of Future Violations of Sections 5(a) and 5(c) of the Securities Act and Section 15(a) of the Exchange Act.

The Court concludes that defendants acted in good faith at all times relevant to this proceeding. Based upon various legal opinions they obtained, defendants had a good faith belief that the partnership interests were not securities and therefore did not have to be registered under the Securities Act.

Defendants fully cooperated with the SEC. They voluntarily met with the SEC when asked about their business and provided the SEC with any documents it requested. After meeting with the SEC, defendants made changes to their business practices at the suggestion of the SEC. In addition, Mr. Beasley and Mr. Wyer each testified that Merchant Capital made the decision to stop soliciting new RLLP partners upon the filing of this action, and informed the SEC of this decision. (PIT. 514:19–515:20; PIT.600:11–24.)

The Court finds that Mr. Wyer and Mr. Beasley are credible. Even if the Court had determined that the RLLP partnership interests were securities, the SEC has failed to prove that, in the absence of injunctive relief, defendants are likely to commit future violations of the registration requirements of Sections 5(a) and 5(c) of the Securities Act, or the Broker–Dealer requirements of Section 15(a) of the Exchange Act.

### B. The SEC Failed To Present a Prima Facie Case of Past Violations or To Prove the Likelihood of Future Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5 Promulgated Thereunder.

In order to prove a violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, the SEC must show that any omissions or misrepresentations were material and were made with scienter. Scienter is "an *intent* on the part of the defendant to deceive, manipulate or defraud." *Aaron v. SEC,* 446 U.S. 680, 686, 100 S.Ct.

1945, 64 L.Ed.2d 611 (1980)(emphasis supplied).

Plaintiff need not prove scienter with respect to its claims under Section 17(a)(2) and Section 17(a)(3), but scienter is relevant to whether the Court should enjoin future violations of these provisions. As the Supreme Court noted in *Aaron*:

> An important factor in this regard is the degree of intentional wrongdoing evident in a defendant's past conduct. Moreover, as the Commission recognizes, a district court may consider scienter or lack of it as one of the aggravating or mitigating factors to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief. And the proper exercise of equitable discretion is necessary to ensure a "nice adjustment and reconciliation between the public interest and private needs."

446 U.S. at 701, 100 S.Ct. 1945 (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944)).

### 1. *Defendants Made No Material Misrepresentations or Omissions.*

The SEC has alleged that Merchant Capital and its principals made material misrepresentations and omissions to prospective partners in connection with the offer and sale of securities. Based on the findings set out above in the Court's Findings of Fact, the Court concludes that defendants made no misrepresentations or omissions of material facts to prospective RLLP partners.

### 2. *Defendants Did Not Act With Scienter.*

Merchant Capital had no motive to make any of the purported misrepresentations or omissions alleged by the SEC and did not benefit in any way from them. Defendants relied in good faith upon information they had received from New Vision, including a number of legal opinion letters that opined that RLLPs are not securities. (PIT.229:3–5.) Defendants knew that at least two of the leading companies in this industry used the RLLP structure. (PIT. 492:5–12.) Indeed, one of these companies, Collect America, once partnered with one of plaintiff's expert witnesses, Louise Epstein, who agreed that Collect America was an "established, reputable and successful company." (TT.197:9–15.)

Defendant Beasley, an attorney, performed his own independent legal research regarding RLLPs and found nothing that was inconsistent with the legal opinion letters he was provided by New Vision. (PIT.169–18–22.) Beasley also had extensive discussions with New Vision's legal counsel regarding the RLLP structure. (PIT.492:23–493:6.)

Defendants retained the law firm of Baker, Donelson, Bearman & Caldwell for the purpose of obtaining an opinion regarding whether RLLPs should be considered securities. (PIT.493:9–22.) Baker, Donelson opined that the RLLPs should not be considered securities. (Pl.Ex.17.)

Upon first being informed that the SEC was conducting an investigation concerning their business, defendants cooperated fully with the SEC. Mr. Beasley drove from Nashville to Atlanta to meet with the SEC's counsel the day following the initial call from the SEC, at his own initiative. (PIT.513:2–9.) Defendants produced voluminous documentation and both Wyer and Beasley submitted to repeated interviews and depositions, despite the fact that no subpoenas were ever issued prior to the filing of this action. (PIT.513:10–25.)

Merchant Capital produced all of its bank records to the SEC. (PIT.499:20–22.) Defendants have withheld no information of any kind or form from the SEC. (PIT. 514:17, 18.)

The Court concludes that defendants acted in good faith at all times without the requisite scienter.

### III. *Even If the RLLP Partnership Interests Were Securities, Disgorgement and Civil Penalties Would Still Be Inappropriate.*

■ As discussed above, the Court has determined that the Merchant Capital RLLP partnership interests are not securities. However, even if the Court had reached the opposite conclusion, and determined that the RLLP partnership interests do constitute securities, the Court would still have concluded that disgorgement and civil penalties were inappropriate.

■ If the Court had determined that a federal securities law violation has occurred, it has broad equitable powers to fashion appropriate remedies, including ordering culpable defendants to disgorge their profits. *S.E.C. v. Lorin,* 76 F.3d 458, 461–62 (2nd Cir.1996). The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains. *S.E.C. v. Wang,* 944 F.2d 80, 85 (2nd Cir.1991). District courts have broad discretion, however, in determining both whether to order disgorgement and the amount to be disgorged, if any. *S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1474–75 (2nd Cir.1996). District courts enjoy so much latitude in these matters that a decision not to order disgorgement will not be disturbed by an appellate court unless it is established that the district court abused its discretion. *See, e.g., S.E.C. v. First Jersey Securities,* 101 F.3d at 1475; *S.E.C. v. Posner,* 16 F.3d 520, 522 (2nd Cir.1994). Under the present circumstances, there is insufficient evidence to suggest that defendants' conduct, and the results of the alleged securities violations, warrant disgorgement of any profits. Accordingly, even had the Court found that any securities laws violations had occurred, it would nevertheless exercise its discretion under the facts presented here and deny plaintiff's request for such relief.

■ While money penalties are also available as a remedy, it is inappropriate to impose such penalties upon defendants in the instant action. Pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, upon a proper showing, district courts may impose such penalties. The decision to impose a penalty, and the amount of any such penalty, lies within the discretion of the Court. *See* 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 77t(d)(1). District courts are not required to impose such penalties and no minimum penalty is mandated by code. The Securities Act and Exchange Act simply provide tiered categories establishing limitations which the penalties may not exceed. 15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2). These limitations, and ultimately the determination of whether to impose such penalties at all, are guided by the district court's analysis of the underlying facts and circumstances. Specifically, the intent of the defendant strongly influences, if not controls, such determinations. 15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2). For instance, if the alleged securities violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirement," the Court is empowered to impose a heftier penalty. 15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2).

In the instant action, defendants' conduct and the alleged securities violations have not evidenced the requisite fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirement to support the imposition of any substantial money penalties. In fact, a proper showing has not been made to justify the

imposition of money penalties in any amount, pursuant to Section 20(d) of the Securities Act or Section 21(d)(3) of the Exchange Act. Even if the Court had found any securities violations in the matter now before it, therefore, it would still exercise its discretion and deny plaintiff's request for such relief.

### CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court DENIES plaintiff's requests for a permanent injunction, disgorgement, and imposition of civil penalties and DIRECTS the Clerk to enter final judgment in favor of defendants.

IT IS SO ORDERED, this *10th* day of November, 2005.